DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

# STATE OF NEW JERSEY.

JUNE TERM, 1883.

---

JAMES B. GRAVES, PLAINTIFF IN ERROR, v. STATE, DEFENDANT IN ERROR.

1. By section 45 of the Criminal Procedure act it is provided that in an indictment for murder it shall not be necessary to set forth the manner in which, or the means whereby, the death was caused, but that it shall be sufficient to charge that the defendant wilfully, feloniously and of his malice aforethought, killed and murdered the deceased.
2. No right of a defendant is violated, nor any privilege of his disregarded or contravened, by convicting him of murder in the first degree on an indictment which described the crime merely, according to the statutory form.
3. It is not error to refuse to charge that if there be a reasonable doubt in the mind of the jury as to the sanity of the accused, they should resolve the doubt in favor of his insanity. The plea of insanity is a defence, and the burden of proving it is on the accused.
4. The defence of insanity, while not disfavored by the law, is regarded with jealousy, and in the interest of public justice it is subjected to a close and careful scrutiny. It must be proved to the satisfaction of the jury, and it may be established by the preponderance of proof. In other words, it must be sustained by the evidence.

. In error to the Supreme Court. The opinion in said court will be found *ante p.* 203.

Upon the trial of the case at the January Term, 1882, of the Essex Oyer and Terminer, the case was submitted to the jury upon the following charge by Judge Depue:

"GENTLEMEN OF THE JURY—The prisoner at the bar is on trial on an indictment for murder in causing the death of Edward Soden, by shooting him, in this city, on the evening of the 20th of December last. Under the form of this indictment the prisoner may be convicted of murder of the first or murder of the second degree. The classification of murder into two degrees is made by statute, and the statute requires the jury, on a conviction, to designate by their verdict whether they find the accused guilty of murder of the first degree or murder of the second degree. The distinguishing feature between the two degrees of murder is the intent with which the homicidal act was done. If the intent was to do mere bodily harm, the offence is murder of the second degree; if the intent was to take life, it is murder of the first degree. No particular length of time need intervene between the formation of the purpose to kill and its execution. It is not necessary that the deliberation should continue one hour or a minute. It is enough that the design to kill was fully conceived and purposely executed.

"It is on this branch of the case—whether the accused killed the deceased, and whether he is guilty of murder of the first or second degree—that he is entitled to the benefit of a reasonable doubt. The evidence in this case puts these subjects beyond a possible doubt. The killing is admitted. That the purpose of the prisoner was to kill is shown by the most satisfactory proof. He used a deadly weapon, held so close to the body of the deceased, in close proximity to the vital parts, that escape from death would have been miraculous. He lay in wait for the deceased, and when he saw the deceased lighting the lamp he advanced upon him, and, placing the pistol close to his back, fired the fatal shot. In-

Graves v. State.

deed, gentlemen, the prisoner admitted on the stand that he left the house on Commerce street in the evening, about the time the deceased was accustomed to leave his home to perform his daily round of duty, for the purpose of finding the deceased with intent to shoot him. The evidence, beyond all controversy, shows a killing of the deceased with a deliberately-formed purpose to kill, and consequently the prisoner, if guilty at all, is guilty of murder of the first degree.

"The single point in controversy is whether the accused is criminally responsible for the act.

"The defence is insanity. Against such a defence the law entertains no prejudice. On the contrary, if a defence of this character be properly proved and sufficiently established, the law accords the accused the full benefit of it by an acquittal of all criminal responsibility. But with regard to the methods by which such a defence may be made successful, the law, from considerations of public policy—the welfare of society and the safety of human life—proceeds with the greatest circumspection, exacting, in the proof of such a defence, strict compliance with the standard adopted by the law for determining where criminal responsibility ends and criminal irresponsibility begins.

"In the first place, the burden of proof rests upon the accused. The law presumes that every man is sane until the contrary be proved. Hence when an accused sets up the defence of insanity the burden of proof is upon him, and, to make effectual such a defence, the proof of the prisoner's insanity must be satisfactory. He must overcome the legal presumption of sanity by a clear preponderance of proof, and by the most satisfactory evidence.

"The prisoner has been examined as a witness. He was a competent witness in his own behalf. But his testimony should be closely scrutinized and received with great caution—especially where it relates to the state of his mind at the time of the homicide; for insanity is a disease and not a transient impulse of the mind, and manifestations of the existence of the disease, before and after the commission of the deed,

would naturally be expected. You should be fully satisfied that his statement in that respect is corroborated and supported by the other testimony with regard to his mental condition before you acquit on that ground. If, on a defence of this kind, persons accused of crime could discharge themselves by their own testimony, the most disastrous consequences would ensue.

"In the next place, the law adopts a standard of its own as a test of criminal responsibility—a standard not always in harmony with the views of scientists. Many of the forms and degrees of mental disease which, in the judgment of learned men, would be regarded as insanity, are utterly rejected by the law in the administration of criminal justice. The law regards insanity as a disease of the mind, implying fixedness and continuance of mental condition. It therefore rejects the doctrine of what is called emotional insanity, which begins on the eve of the criminal act and ends when it is consummated. Says a writer who has given much attention to this subject: 'Insanity is only a manifestation of disease of the brain. The doctrine that an individual can be entirely sane immediately before and after any particular act, and yet insane at the instant the act was committed, is contrary to every principle of sound psychological science.'

"The law also utterly repudiates, in criminal prosecutions, such defences when based on a defective or perverted moral sense—generally known as moral insanity. A person who steals the property of another, knowing the nature of the act he is doing, whose moral sense is so perverted that he cannot restrain his propensity to steal, is sometimes called a kleptomaniac, but in law he is regarded as a thief and is punishable as such.

"The doctrine of moral insanity as a defence to a criminal accusation has been repudiated by an almost unbroken current of decision, as hostile to the principles of law and to the welfare of society. If the persons from whom the subjects of criminal law are derived should be permitted to prosecute their avocations because they are such as their moral propensities have led them to adopt, the object of organized society—the

preservation of life and property—would be defeated. Stripped of its high-sounding name, moral insanity is wickedness, depravity. Laws are enacted and courts established for the suppression of crime begotten of such causes, and therefore moral insanity—crime excused on the ground of a defective or perverted moral sense—has no place in the criminal law. Furthermore, the law not only considers insanity, when offered as a defence to a criminal charge, as a disease of the mental faculties, but it also prescribes the degree of the mental disorder or disease which shall be exacted as the condition on which a defence of insanity shall be allowed; for it is not every kind nor every degree of insanity that will render a man irresponsible for acts of atrocity. The law does not require, as the condition on which criminal responsibility shall follow the commission of crime, the possession of one's faculties in full vigor, or a mind unimpaired by disease or infirmity. The mind may have been so weakened by disease as not to be capable of realizing the enormity of the crime, or may have become so irritable and excitable, through a life of degrading vice and sensual indulgence, as to induce an undue resentment of injuries and insults, and yet the accused will be criminally responsible for his acts.

"To establish a defence on the ground of insanity, it must be clearly proved that, at the time of committing the act, the accused was laboring under such a defect of reason, from a disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know that what he was doing was wrong. If an accused has sufficient mind to know the difference between right and wrong with respect to the act he is doing, and to control his conduct under ordinary circumstances, he cannot discharge himself from responsibility by showing that he did the act under the influence of an irresistible impulse. Capacity and reason sufficient to enable the accused to distinguish between right and wrong was adopted as the test of insanity in criminal cases by the English courts as early as 1843. *McNaughton's case*, 10 *Cl. & F.* 200. It was adopted by Chief Justice

Hornblower, in 1846, in the Spencer case, (1 *Zab.* 196,) and ever since the ruling in that case has been regarded as the settled law of this state.

" If, then, on a defence such as has been interposed in this case, it appears, as the result of the evidence, that the accused had sufficient mind to enable him to distinguish between right and wrong, and to control his conduct under ordinary circumstances, he cannot acquit himself on the plea of an irresistible impulse that led him to do the criminal act.

" In further exposition of the law on the subject I will read an extract from an opinion read in the Court of Appeals of New York in 1873. [The judge here read from the opinion of Andrews, J., in *Flanagan* v. *People*, 52 *N. Y.* 469, 470.]

" These principles must necessarily be the governing principles in the administration of the criminal law, or the most heinous crimes—such as murders committed on long deliberation—would be those which would be dispunishable, for such crimes are always committed under the influence of an impulse which overcomes and sets at naught the restraints which usually prevent the commission of crime.

" To give a practical application of these legal principles: the evidence in this case shows that the prisoner and the family of the deceased lived in different parts of the same house ; that difficulties and disputes had arisen between them ; that on one occasion, about two years ago, if not on two occasions, the prisoner became so incensed that he threatened to shoot ; that about two months before the homicide the sister of the deceased threw sand in the window of the room occupied by the prisoner, which greatly annoyed the prisoner ; that Mrs. Podmore, with whom he boarded at that time, required the prisoner to leave her house and get a boarding-house elsewhere, because of the many quarrels and disputes between the prisoner and the Soden family ; that the prisoner procured a boarding-house elsewhere, returning to Mrs. Podmore's house quite frequently to spend a portion of the day, sitting there and reading the newspapers. On the day of the

homicide the prisoner came to Mrs. Podmore's and had his breakfast and dinner, remaining through the day, until evening. Mrs. Podmore says that was one of the days he did not speak nor say anything; that she noticed nothing unusual, only he was talking to himself. The prisoner testified that in the evening, just before night, he got the pistol from the cupboard, and went out to intercept the boy and shoot him; that he stationed himself at the corner of Lawrence and Market streets, and waited a few minutes for him, and that when he saw the deceased lighting the lamp, he shot him. He said he did not think what he was doing—about the harm of it—and had no power to restrain himself. Immediately after the shooting, the prisoner was arrested by an officer, to whom he said: 'He [the deceased] won't bother me any more. Both him and his father has been bothering me for the last two years, and I now guess he won't bother me any more now.' At the station-house he spoke about the shooting, and told the doorman that he had shot the deceased; that he meant to kill him, and would have killed his father if he had had an opportunity, and then asked what the result would be. The doorman testified that 'I told him that in the morning he would go before Judge Ricord and then be committed to the higher court, and there he would be tried for murder; well, he said, he supposed that that would be the result; that he had summed up the cost before that; he presumed that that would be the result of it.' The testimony of these three witnesses—Mrs. Podmore, the officer who made the arrest, and the doorman at the station-house—is of considerable consequence, for it relates to the condition of the prisoner in close proximity to the homicide.

"Now, gentlemen, if, by reason of the habits and mode of life of the prisoner, and the annoyances to which he had been subjected in times past, his mind had become so impaired and diseased that he was incapable of distinguishing between right and wrong with respect to the act he was about to do, he was then, in the eye of the law, insane, and entitled to an acquittal on that ground. But, gentlemen, if the prisoner, though his

mind had been impaired by the causes mentioned, had still sufficient mind to enable him to know the difference between right and wrong, and to control his conduct under ordinary circumstances, he was, in legal sense, sane and responsible for his act; and if, by brooding over his grievances on that day, his passion became so inflamed as to overcome his judgment and impel him to do an act which, if he reflected, he would have known to be wrong, he cannot excuse himself on the ground that he acted under an impulse that he could not resist. Again, the prisoner acted from a motive—inadequate, it is true—but a motive that influenced his conduct. He had had disputes with the Soden family, and with the deceased personally. The boy had jeered him on his personal appearance, a subject on which the prisoner was peculiarly sensitive. The prisoner did not kill his friend, Mrs. Podmore, or a person whom he casually met on the street. He sought out the person from whom he conceived he had suffered an injury. On this subject the testimony of the officer making the arrest, and of the doorman at the station, is of the utmost importance; for if the prisoner had sufficient intelligence, by a process of reasoning, to connect his injuries with the person who inflicted them, and to sum up the cost, before he engaged in the deed, and to anticipate the result that would follow, it would be difficult to deny him the possession of sufficient mind to understand the nature and quality of the act he was about to engage in, and volition in the execution of his purpose. For the question is, not whether the accused, when he engaged in the deed, in fact thought whether the act was right or wrong, but whether he had sufficient mind and understanding to have enabled him to comprehend that it was wrong, if he had used his faculties for that purpose.

" I turn now to the other evidence relating to the prisoner's mental condition. Insanity being a disease, as was said by Dr. O'Gorman, there would be evidence of its existence and manifestation of the disease in the previous and subsequent life and conduct of the prisoner, especially where the insane

condition of the prisoner's mind was produced by a long life of self-abuse.

"The prisoner is sixty-three years old. He learned the trade of a wool-carder, which he followed until he was about twenty-five years old. After that his employment seems to have been manufacturing pumps. He was also the inventor of an improved gun-sight. The books and papers found in his possession show that he was a man of lewd and lascivious tastes. He testifies that, at the age of thirteen, he contracted a degrading habit, which he says he practiced more or less all his life : "That is, I didn't consider it injurious of late years at all—a little ; but then I practiced it a great deal until thirty or forty years of age." Forty years would bring him down to 1859. A journal of his travels, written in 1862, has been produced. It will be useful as evidence of his mental condition after he had partially abandoned the habit. You have seen him on the stand and heard his testimony, and will be able by that means also to form a judgment as to his mental condition. The proof is that the accused was in the habit of chewing his tongue, and of talking to himself. On one occasion he purchased a false face and engaged in fiddling in the street. There is also evidence in relation to his conduct in the prosecution of his business and his intercourse with other persons. I leave the evidence of this class to your recollection and consideration, and call attention to the testimony of the physicians who have been called as experts. I will first read part of Dr. Dougherty's testimony. He was called as a witness for the defence. [The judge here read the testimony of Drs. Dougherty, Hewlett and O'Gorman.]

"Now, gentlemen, the testimony of these witnesses is entitled to great consideration as the opinions of gentlemen of intelligence, learning and experience. It is true that these medical experts examined the prisoner since the homicide. But you will remember that insanity is a disease of the mind, evidence of which naturally would be exhibited in the conduct and actions of the sufferer before and after the period when the crime was committed, especially so when the disease

is supposed to have been the result of degrading and enervating practices, and is a gradual, steady and continuing result of their pernicious effects.

" I now leave this case in your hands. I have been solicitous only that the law should be so expressed that no precedent prejudicial to the public peace or the security of life shall be established. Your duties are also responsible duties. You are to care, on the one hand, that the prisoner shall not be convicted contrary to law, and, on the other hand, you are to see that the law is executed. In both respects your verdict will be a precedent of no common significance. The burden of proof of establishing the defence of insanity is on the prisoner, and he is bound to satisfy you, by the clear preponderance of proof, that he was insane in the sense in which I have defined insanity, before he can escape responsibility for his acts. If he has, by such proof, satisfied your mind of that fact, he will be entitled to an acquittal; but if the evidence on that subject has not convinced your minds that he was insane and irresponsible in the sense in which I have defined insanity, as a legal defence, it will be your duty to convict, leaving the consequences to the law, where they belong."

For the plaintiff in error, *S. Kalisch.*

For the defendant in error, *Oscar Keen.*

The opinion of the court was delivered by

THE CHANCELLOR.    James B. Graves was indicted, in the Essex Oyer and Terminer, at the term of December, 1881, for the murder of Edward Soden. The indictment charged that the defendant did wilfully, feloniously and of his malice aforethought, kill and murder the deceased, and that the killing took place on the 20th day of December, 1881. At the trial the prisoner set up the defence of insanity. His counsel requested the court to charge the jury that under the indictment the accused could not lawfully be convicted of murder of the first degree, and that if they had any doubt as to whether

he was sane or insane at the time he committed the act of killing, they should resolve the doubt in favor of his insanity. The court refused to charge as requested on either point, and the legality of its action in that respect is brought into question under the writ of error.

The counsel of the plaintiff in error insists that inasmuch as the statute confines murder of the first degree to wilful, deliberate and premeditated killing, and killing in perpetrating or attempting to perpetrate certain crimes, and declares that all other kinds of murder shall be of the second degree, the indictment in question, which neither charges premeditation in the killing nor that it was done in the perpetration or attempting to commit any of the specified crimes, will not warrant a conviction of murder in the first degree, and that to convict the accused of murder of that degree under it was therefore to violate his constitutional rights " to be informed of the nature and cause of the accusation," and " not to be held to answer for such a criminal offence unless on the presentment or indictment of a grand jury."

The legislature, by the sixty-eighth section of the act for the punishment of crimes, (*Rev.*, *p.* 239,) provides that all murder which shall be perpetrated by means of poison or lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in perpetrating or attempting to perpetrate certain specified crimes, shall be deemed murder of the first degree; and that all other kinds of murder shall be deemed murder of the second degree; and that the jury before whom any person indicted for murder shall be tried shall, if they find such person guilty thereof, designate by their verdict whether it be murder of the first or second degree; and that if such person shall be convicted on confession in open court, the court shall proceed, by examination of witnesses, to determine the degree of the crime, and give sentence accordingly. By the forty-fifth section of the Criminal Procedure act, (*Rev.*, *p.* 275,) it is provided that in any indictment for murder or manslaughter it shall not be necessary to set forth the manner in which or the

means by which the death of the deceased was caused, but that it shall be sufficient in every indictment for murder to charge that the defendant did wilfully, feloniously and of his malice aforethought, kill and murder the deceased.

The legislature, in declaring what shall constitute murder of the first degree and what murder of the second, created no new crimes, but merely made a distinction, with a view to a difference in the punishment, between the most heinous and the less aggravated grades of the crime of murder. That which was murder at the common law was, after the statute, still murder here, but the most flagitious species was designated as the highest degree and visited with the extreme penalty, while all others were declared to constitute a lower class and to be punishable accordingly. When the legislature, commendably simplifying the form of the indictment, provided that in charging the crime it should not be necessary to set forth the manner in which or the means whereby the death was caused, but that it should be sufficient to charge that the defendant wilfully, feloniously and of his malice aforethought, killed and murdered the deceased, it merely provided that in a charge of murder, a crime well understood and defined in the law, it should be enough to charge the crime in language sufficient to designate it. It also provided that if the jury should find the accused guilty of murder, they should by their verdict say whether it was murder of the first or second degree, and that if the conviction was on confession, the court should ascertain and fix the degree. The statute did not make murder of the first degree a separate and distinct crime from murder of the second, but murder of each grade, after the passage of the statute, continued to be, as it had theretofore been, the crime of murder. The indictment in the statutory form is for the crime of murder, without regard to the degree. Under such an indictment, the defendant is not only informed of the nature and cause of the accusation, but is apprised of what it is exactly. It is a charge of murder, and the cause the wilful and felonious killing, by him, of the deceased, of his malice aforethought. The offence for which he is called

to answer is charged in the indictment. It is murder. According as he shall or shall not be proved to have committed the crime of murder, he will be convicted or acquitted; and if convicted, according as it shall be proved that he committed it under circumstances which characterize the one degree or the other, so it will be found or adjudged with a view to his punishment, and he will be punished accordingly.

No right of the defendant was violated, nor any privilege of his disregarded or contravened by convicting him of murder of the first degree on an indictment which described the crime according to the statutory form.

Nor was there any error in the refusal of the court to charge as requested by the prisoner's counsel on the subject of insanity. They had charged that the burden of proof of the alleged insanity was on the accused; that the law presumes that every man is sane until the contrary be proved, and that therefore, when an accused sets up the defence of insanity, the burden of proof is upon him, and that to make effectual such a defence, the proof of the prisoner's insanity must be satisfactory, and that the accused must overcome the legal presumption of sanity by a clear preponderance of proof and by the most satisfactory evidence. They were asked to charge that if there was a reasonable doubt in the mind of the jury as to the sanity of the accused, they should resolve the doubt in favor of his insanity. The plea of insanity is a defence, and the burden of proving it is on the accused. The law presumes or assumes that at the time of committing the act for which he is tried he was sane, and the state is therefore not called upon to prove that he was so. If he sets up in his defence the plea of insanity, it is incumbent on him to establish it, and if he fails to do so the presumption or assumption of sanity still stands; for it has not been overcome or shown to be false. By the request to charge under consideration, the accused, in effect, asked the court to direct the jury to give him the benefit of the defence notwithstanding they should find that he had not proved it. It is manifest that if the burden of establishing the defence is upon the accused, the propo-

sition involved in that request cannot be maintained. That proposition is that though the accused may have failed to es-tablish his insanity, yet, if he has succeeded in casting doubt on the subject, he is therefore, and on that ground alone, en-titled to the same benefit of the defence as if he had proved it. If the burden of proving the defence is on the accused, as it undoubtedly is, it follows that he is not entitled to the benefit of the plea unless he establishes it. While, for obvious reasons, the defence of insanity is not disfavored by the law, yet in view of its peculiar character, and in order that it may not serve as a screen for guilt, it is regarded with jealousy, and in the interest of public justice, and in accordance with the sound dictates of a wise and necessary public policy, it is sub-jected to a close and careful scrutiny. The defence must be proved to the satisfaction of the jury, and it may be estab-lished by the preponderance of proof; in other words, it must be sustained by the evidence.

The judgment of the Supreme Court should be affirmed.

*For affirmance*—THE CHANCELLOR, DIXON, REED, SCUD-DER, CLEMENT, COLE, GREEN, KIRK, WHITAKER.    9.

*For reversal*—MAGIE, PATERSON.    2.