THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. JOSEPH JULIANO, ALIAS "BIG JOE;" CHRISTOPHER BARRONE, LOUIS CAPOZZI, ALIAS "KID ROFF," AND NICK JOSEPH JULIANO, ALIAS "LITTLE JOE," PLAINTIFFS IN ERROR.

Argued February 14, 1927—Decided September 15, 1927.

1. Where several defendants are charged with murder, as actual participants in a robbery during which the killing was perpetrated, an indictment charging murder in the language of the statute is sufficient, without charging the defendants as principals or as accessories, and without setting forth the robbery as part of the crime.
2. An application for a severance, based upon section 64 of the Criminal Procedure act, has no force so long as the indictment remains in the Court of Oyer and Terminer.

3. By the terms of section 9 of the Chancellor Jury Commissioner's act (*Supp. Comp. Stat., p.* 835), where so indicated by an order of the Supreme Court justice, panels of jurors chosen for different periods in the term are for the time being a general panel and the only panel of jurors then serving or available.

4. The scruples of a prospective juror against capital punishment which precluded the finding of a verdict without recommendation for life imprisonment is a proper cause for challenge by the state.

5. A photograph of the scene of a crime, made after the commission of the crime, which photograph showed movable objects, is admissible in evidence as a reproduction of the place only, where the subsequent proofs showed the connection of the movable objects to the *locus in quo.*

6. On the trial of a criminal charge it is not competent to prove that the accused committed other crimes of a like nature for the purpose of showing that the accused would be likely to commit the crime charged in the indictment.

7. A witness cannot be asked to pass upon the implications to be drawn from two statements made by him. If such statements existed and could be produced, they could be offered in evidence if relevant, and if not available, resort must be had to proof of their contents, whereupon it would be for the jury and not the witness to pass upon the variance in the two.

8. On an indictment for murder, where the state had shown that the weapon used in the killing was a revolver of large size, it was competent to show that the defendants, or some of them, had been equipped with such weapons during the week preceding the killing.

9. Mistakes in punctuation do not afford grounds for reversal.

10. It is not the right of a defendant to choose the language in which the court should state to the jury the pertinent instructions to which the defendant is entitled.

---

On error to the Court of Oyer and Terminer of Essex county.

For the plaintiffs in error Joseph Juliano, Christopher Barrone and Louis Capozzzi, *John W. McGeehan, Jr.*

For the plaintiff in error Nick Joseph Juliano, *William A. Kavanagh.*

For the defendant in error, *Joseph L. Smith,* prosecutor of the pleas (*John O. Bigelow,* of counsel).

The opinion of the court was delivered by

LLOYD, J.　The writ of error in the above-entitled cases bring before this court the conviction of the appellants of the crime of murder in the first degree without recommendation to life imprisonment, and the consequent sentence of death.　Both appeals are here on bills of exceptions and on specifications of causes for reversal under the one hundred and thirty-sixth section of the Criminal Procedure act of 1898.　Briefs have been filed by counsel in the respective cases, but with few exceptions to be hereinafter noted, both rely upon substantially the same grounds for reversal.

The history of the crime itself, as developed by the testimony, was that George Condit was employed by the Reid Ice Cream Corporation.　That corporation had a plant and office on the east side of Mt. Pleasant avenue north of Clay street, in the city of Newark, and among the duties of Condit was the depositing in bank of moneys received in the office.　On the morning of July 19th, 1926, a large deposit of cash and checks totalling more than $14,000 was prepared and placed in two bags.　About ten o'clock on this morning Condit, accompanied by another employe named Duff, received the bags from the cashier of the corporation.　Each carrying a bag, they proceeded to the street, intending to enter a Chevrolet automobile used for transporting the money to the bank. Duff got in on the left side of the car which was facing the wrong way on the street, and Condit passed around the rear of the car to the right side.　As the latter reached the right side a large green Pierce Arrow automobile drove up, and while Condit was in the act of handing his bag to Duff there was a command from the large car to "stick 'em up."　A shot followed and at the same moment a man came in between the cars, grabbed one bag; there was another shot, and then both bags were thrown into the large car and it sped away. Condit and Duff were both wounded and hurried to a hospital; Condit, however, dying on the way.

On the 14th of October following a man named Robert W. Boudreau was arrested, and from him information was elicited which led to the arrest of the four appellants.　All were

indicted for the murder of Condit, but Boudreau became a witness for the state and was not tried. The trial of the appellants began on November 15th, 1926, and ended on December 2d following.

The defense interposed as a complete denial by each and all of the defendants of the participation in the crime, and supplemental to such denial proof of an alibi was introduced on behalf of each. In the case of Joseph Juliano (called in the trial "Big Joe"), Barrone and Capozzi, eighty-one assignments of error and eighty-two specifications of causes for reversal are filed in this court, and in that of Nicholas Joseph Juliano (called in the trial "Little Joe") ninety-five assignments of error and one hundred and three specifications of causes for reversal are filed. The specifications of causes for reversal are in general duplications of the assignments of error in the respective cases.

In the briefs filed in both cases the grounds upon which a reversal is asked are grouped, and for sake of comprehensive review they will be in like manner considered in this opinion, and will be taken up in the order in which the matters to which they refer arose in the proceedings below.

Preceding the trial itself a motion was made on behalf of Nicholas Joseph Juliano to quash the indictment, and a motion was made on behalf of all the defendants for a continuance of the cause. Both motions were denied by the trial court and are assigned as causes for reversal here.

Supporting the first motion it was and is contended that the indictment was faulty in that it did not apprise the defendants "whether they were charged as principals or as accessories, and in that it did not set forth the robbery as part of the crime."

These motions preceded the trial itself and rested in the sound discretion of the court. They are therefore not reviewable in this court either on bill of exceptions or upon a "certificate of the entire record of the proceedings had upon the trial." *State* v. *Harris,* 100 *N. J. L.* 184. If, however, we examine the questions sought to be presented, as was done in the case of *State* v. *Lynch, ante, p.* 64, we find these grounds

without merit. As to the indictment, it set forth the crime of murder in the language of the statute and charged all of the defendants as principals. As actual participants in a robbery they were all principals, and as such were tried, convicted and sentenced. Nor was it necessary to incorporate in the indictment the fact of robbery as part of the crime charged. In the case of *Titus* v. *State,* 49 *N. J. L.* 36, it was held by the Supreme Court, citing *State* v. *Graves,* 45 *Id.* 347, in this court, that an indictment in statutory form sufficiently charges the crime of a murder in which rape forms an essential element. In the views expressed and the conclusion therein reached we concur. The case is therefore controlling where robbery is involved.

The motion for a continuance was predicated on the statement of counsel that an additional week or two was necessary to enable the defendants to prepare their case. The crime was committed July 19th, the defendants were arrested October 15th and indicted October 19th. To the indictment they entered pleas of not guilty on October 25th and the case proceeded to trial on November 15th, just one month after arrest, twenty-seven days after indictment and twenty-one days after their arraignment. In the absence of persuasive proof that the time thus afforded was insufficient for the preparation of a proper defense, we think the time was ample, and denial of the motion, unsupported as it was by such proof, affords no ground of complaint.

The next step in the cause was an application by Joseph Juliano, Barrone and Capozzi for a severance in their trial from Nick Joseph Juliano, which motion was overruled. This ruling presents the next point raised on the appeal. The application was rested on section 64 of the Criminal Procedure act of 1898 (*Comp. Stat., p.* 1841), which reads:

"When two or more persons are or shall be jointly indicted for the same offense, except for conspiracy, and such indictment, before the trial thereof, hath been or shall be removed into the Supreme Court of this state, by *certiorari* or otherwise, any one of the said persons, on application to said Supreme Court, upon affidavit that some one or more of said

persons so jointly indicted with him, whom he shall name, is or are, as he is advised by his counsel, whom he shall also name, and verily believes, a material witness or witnesses for him on the trial of said indictment, and without whose testimony he cannot safely proceed to trial, shall, by order of said Supreme Court, be allowed a trial separate from the person or persons whom he shall so name as such material witness or witnesses."

By the plain terms of this section of the act, to obtain the privilege accorded the indictment must of necessity be removed into the Supreme Court, and the application must be addressed to that tribunal. So long as the indictment remained in the Oyer, section 64 had no application or binding force; the rights of the defendants were governed by the common law. The application preceded the trial itself, was addressed to the discretion of the court (*State* v. *Nixon,* 86 *N. J. L.* 371; *State* v. *Bassone,* 89 *Id.* 724), and could not be made the subject of review in this court. *State* v. *Harris, supra.* But here again, if we consider the meritorious question, the appellants are without ground of complaint. The application was predicated on an affidavit by the appellants that Nick Joseph Juliano was a material witness for them and each of them, and that they might be deprived of his testimony. The obvious answer is that all of the defendants were competent witnesses; all of them could refuse to testify to matters which might incriminate them. These propositions were true whether the trial was joint or several, and it is not conceivable that the rights of any were jeopardized by the ruling of the court, and especially in view of the fact that Nick Joseph Juliano was actually called as a witness in his own behalf and in behalf of his co-defendants.

The next contention is that the court erroneously refused to sustain the defendants' challenge to the array of jurors. Section 82 of the Criminal Procedure act (*Comp. Stat., p.* 1847) provides that the list of forty-eight names shall be drawn "from the general panel of jurors that may have been drawn and summoned to attend as jurors at the term at which such defendant is to be tried." It was contended in the trial

court and is contended here that the statute was not complied with in that the trial panel was drawn from a part of, and not from the entire, general panel.

In 1913 the act known as the Chancellor Jury Commissioners' act was passed. *Supp. Comp. Stat., p.* 835. That act provides (section 5) that the commissioners appointed thereunder shall make two lists of persons liable to jury duty containing not less than five hundred names, one copy of which shall be delivered to the justice of the Supreme Court assigned to hold the Circuit Court in the county, and the other list filed in the office of the county clerk at least twenty-five days prior to the commencement of each term of the Circuit Court.

Section 6 provides for the depositing in a box of numbered pieces of metal corresponding to the numbers set opposite the names on the jury list. Section 7 provides that from this box shall be drawn singly such number of the pieces of metal as the justice or judge shall direct and the persons whose names are found on the jury list opposite the numbers corresponding with those on the pieces of metal so drawn shall constitute the panel of petit jurors to serve for the next ensuing term and shall be so summoned.

Section 9 provides that the "justice of the Supreme Court may direct that the panel of petit jurors so drawn shall serve for a designated portion of the next ensuing term only, and in such event they shall be so summoned, and the said justice may direct said commissioners at a time to be fixed by the justice, to draw a new panel or panels of petit jurors to serve for another designated part of such term, and such new panel or panels shall be drawn and summoned from the list certified by the commissioners prior to the commencement of such term in the same manner as hereinabove provided."

In the county of Essex, the provisions of section 9 are availed of and panels of petit jurors are drawn to serve for periods of two weeks each. The special panel of forty-eight names drawn and served upon the defendants was taken from the fourth panel of petit jurors for the September term, composed of one hundred and fifty persons, summoned in accord-

ance with such order on November 10th, 1926. This was the panel serving at the time in the courts of the county. It is contended by the appellants that the forty-eight names should have been drawn from the combined panels of the term and not from the panel then serving, and that the approximately six hundred names comprising these panels should have been placed in the box and the forty-eight names drawn therefrom.

We think this contention is unsound. By the terms of the act of 1913, where so indicated by an order of the Supreme Court justice, panels chosen for different periods in the term are for the time being a general panel and the only panel of jurors then serving or available. The panels previously summoned and serving had ceased to be jurors, as by section 9 they shall serve for the designated portion "only." In like manner those that might follow, if any, had not yet come into existence. It results, therefore, that for all purposes within the contemplation of the statute the current panel of jurors then serving constituted the general panel. If the contention of the appellant were valid an absurd result might readily be conjectured. Section 9 contemplates that the order of the justice of the Supreme Court shall antedate the opening of the term, and that from the names originally placed in the box there shall from time to time be drawn new panels to serve for the designated parts of the term. If in the present case the defendants had been placed on trial during the period in which the first panel was serving, obviously the panels yet to be drawn (as in this case on November 10th) would be unknown and unavailable as jurors, inasmuch as the original placing of the numbers in the box does not constitute them jurors, but simply material from which actual jurors should be obtained. The statement of such a result evinces that the currently serving jury must of necessity be the general panel within the contemplation of the statute, and the only panel from which jurors qualified to try the defendants could be secured.

The next point raised in sequence is that the court erroneously sustained the challenge made by the state to jurors whose scruples against capital punishment precluded their

finding a verdict without recommendation for life imprisonment. Inasmuch as it appears that none of the defendants had exhausted their peremptory challenges they suffered no injury by reason of this ruling of the court. *State* v. *Langhans,* 95 *N. J. L.* 213. Apart from this fact we think the challenge was properly sustained. By chapter 134 of the act of 1919 (page 303) it is provided that "every person convicted of murder in the first degree * * * shall suffer death unless the jury shall by their verdict and as a part thereof, upon and after consideration of all the evidence, recommend imprisonment at hard labor for life, in which case this and no greater punishment shall be imposed." It was the privilege of the state to contend before the jury under this statute that upon the evidence the crime was of such atrocity that the jury's verdict should be without recommendation. It was the right of the state to have jurors who would receive this contention with open mind, and when the jurors, upon their examination, disclosed that this phase of the case could not be so submitted to them they were obviously disqualified to pass upon one of the phases of the evidence as to which they might or might not exercise the clemency contemplated by the statute. If sworn as jurors their scruples would shut out this proof and be in defiance of the law which submitted to them the proper punishment to impose on the defendants based upon the evidence solely. To hold otherwise might be to, in effect, work the practical abolition of capital punishment in this state; a function and right of the legislature only. The murder trial is rare in which numbers of the general panel of jurors are not found conscientiously opposed to capital punishment. With the limited number of peremptory challenges allowed to the state, the probable inclusion on the trial panel of one or more jurors so opposed would necessarily result in a verdict of life imprisonment or a disagreement. The conclusion we have reached is fortified by authority generally throughout the country. Many states have committed to juries the power to render verdicts "without capital punishment" or to substitute imprisonment for the death penalty. Disqualification to bring a capital verdict has repeatedly been held a cause for challenge. 35 *C. J.* 355.

It is next contended that the court erred in admitting in evidence a photograph offered by the state. The objection no doubt intended to be made was that the photograph showed movable objects (an automobile and a motor truck) which were not present at the time of the shooting. It developed that the particular objects were so placed by the state to illustrate the position of the identical vehicles at the time, and proof to this effect was thereafter produced. In admitting the photograph, however, the court was careful to admit it as a reproduction of the place only. The subsequent proofs removed any objection there could have been to the presence in the picture of the automobile and truck. Considered broadly, appellants' contention would practically exclude the use of photographs of the *locus in quo* of street crimes, as in this busy day vehicles are continually present, standing and moving, and fall within the focus of the photographic lens. The contention is, we think, without merit.

We are next called upon to reverse because of rulings upon the admission and rejection of evidence. The first point refers to the exclusion on cross-examination of the following questions to the witness Boudreau: *"Q.* Who did you go around with about the time this holdup occurred? Who were your friends?" *"Q.* And they committed crimes with you, did they not?"

Boudreau was *particeps criminis* with the defendants, and though indicted with them was not tried, but became a witness for the state. Counsel had been permitted to cover a wide range in the cross-examination of this witness, and was finally checked on objection by the state to the questions above indicated. We think the court was right in its ruling. The questions were sought to be supported upon the grounds that the answers would affect the credibility of the witness and also show that he and his companions were probably the real principals in the crime charged against the defendants. They were competent for neither purpose. A test of credibility is the probable truthfulness of the witness, and conviction of crime is evidence bearing on the subject as is the general reputation for want of veracity. Credibility is not disproven

by either of the questions propounded, and as proof of the authorship of the present crime, it was incompetent. *Bullock* v. *State,* 65 *N. J. L.* 557. In that case it was said by Chief Justice Depue, speaking for this court: "On the trial of an accused for a crime it is not competent to prove that he committed other crimes of a like nature for the purpose of showing that the accused would be likely to commit the crime charged in the indictment. * * * On the trial of a criminal charge, it is not relevant to show that the defendant has committed other similar crimes which are not connected in any way with the one in question."

It is next claimed that the court erred in sustaining the objection of the prosecutor to the question to Boudreau: "*Q.* How long after that was the next one [statement] signed?" "*Q.* Two statements you made before and which you signed differ from each other and differ from the testimony given by you at this trial." While the first question might well have been answered, its exclusion was not harmful to the defendants in that the witness had already stated that the first statement preceded the second by a short interval and he could not recall the date, and even if the witness' memory were not fully probed it is not apparent that the relative dates were of importance. The second question was improper. It was not for the witness to pass upon the implications of the two statements made. If they existed and could be produced they could be offered in evidence if relevant, and if not available, resort must be had to proof of their contents. It was then for the jury and not for the witness to pass upon the variance in the two.

It is next contended that the judge erroneously limited the cross-examination of Boudreau by counsel for the defendant Nick Joseph Juliano to subjects dealt with in the examination-in-chief, excluding those brought out by the cross-examination of counsel for his co-defendants. While such limitation did occur at one state of the trial, the court reversed its ruling at a later stage and accorded to counsel the fullest opportunity of cross-examination, both upon matters touching

the state's examination and on matters covered by the cross-examination of counsel for the remaining defendants. This privilege was availed of and the earlier ruling affords to the appellant no ground of complaint.

The next point argued is that the court improperly excluded certain questions asked on cross-examination of Philip Siegel, a witness called by the state. These questions were: "*Q*. Did you tell the officers that came to your store that one of the persons that you saw was about thirty-five years old, five-eleven, thin face, light complexion?" "*Q*. Who was that officer; do you know what his name was?" The first question had already been answered and the second was not relevant. It is apparent that it was a mere inquiry for the purpose of furnishing counsel with information; it had no bearing on the case as it stood.

The witness was also asked the following questions: "*Q*. Didn't you tell the detective who came to your store a couple of days after the holdup that there were four men and not five men in the holdup?" "*Q*. Were you shown by the police who came to your store a police circular saying four men were sought and one of them was of light complexion * * * and did you say that the description of these four men there was correct?" "*Q*. Now, I ask you this question: If you were shown pictures of these men, you did not identify them as being the men you saw participate in the holdup, did you?" The cross-examination of Siegel had been unusually persistent and tedious, covering seventy-five pages of the printed record. It had taken a wide range and some of the questions above enumerated had already been answered. The questions were finally objected to as not identifying to the witness the occasion by naming the officers referred to, and plain intimation was given to counsel by the court that if the occasion were so identified the question would be permitted. Counsel refused to avail himself of this privilege but stood upon his asserted rights. In this situation we cannot say that the defendants suffered manifest wrong or injury.

The same condition and conclusion applies to the next following point presented for review by the same appellants.

It is next contended that the court erred in overruling the objection to a question asked by the prosecutor of a witness Kinney: *"Q.* What case was he present in connection with?" And in denying the motion of defendants' counsel to strike out the answer: "He was brought in in reference to the Ward case," and in the denial of a motion for a mistrial in consequence of the answer. This inquiry was called forth by a confusion that had arisen respecting identifications made by a boy named Clark, and an inference that might be drawn by the jury that the state had testimony favorable to the defendants which it was attempting to suppress. In order to dispel this the state was seeking to show that the boy's attempted identifications referred to another case. Just what the "Ward case" meant does not appear, but it is stated in appellants' brief that it was a notorious holdup in which a policeman was shot, and it is urged that this question and answer gave the impression that the police considered the present defendants guilty of that crime. We think the court was right in permitting the question, regardless of its possible effect, but it is proper to note that if the injection of the Ward case into the present trial was harmful, the defendants themselves were responsible in that their counsel had already evoked from Kinney testimony respecting lineups in the two cases.

The next point is that the court erred in admitting proof by a witness Carrington (a porter at a Turkish bath) that Joe Juliano and Barrone came into the bath at night during the week preceding the murder and that Juliano handed him three very large revolvers wrapped in a cloth to keep while he was in the bath. The objection was on the ground of irrelevancy. The state had shown that the weapon used in the killing was a revolver of large size (the shells being of forty-five calibre). It was competent to show that defendants or some of them were equipped with such weapons as fully as if in the event the means of death had been the use of arsenic, it would have been competent to show that the defendants had about the time of the crime possessed such a poison. 3 *Greenl. Evid.,* § 137.

It is next urged by counsel for Barrone, Capozzzi and Joseph Juliano that there was error in the overruling of a series of questions asked by defendants' counsel of Betty M. Hanley, a witness for the state. The witness had identified Barrone as seated in the back seat of the car, as looking up at the window at which she and another girl were standing and pointing a gun at her and telling her to keep still. The questions were directed to ascertain the ability of the witness to remember faces. One of these was, "You have been mistaken in your young life on memory of faces?" Another, "Have you a pretty good memory of faces of persons you saw on that day at police headquarters?" "Have you ever tested your ability to remember faces?" "Have you ever in any one way trained yourself to remember faces?" The examination of the witness had been long and exhaustive and had these questions been the only ones testing her powers of observation they might well have been admitted, but from her very careful identification of Barrone, the minute details observed and noted, it was quite apparent that whether her memory was trained or otherwise, or had lapsed in early years, her ability to observe at the time of the shooting was fully tested. In the circumstances we think the rulings rested in the sound discretion of the court, and do not justify a reversal. 2 *Wigm. Ev.,* § 995.

The next assignment by the same counsel is to the refusal of the court to admit a question on cross-examination of Joseph Guilano, a detective, as to whether the witness Siegel was shown a picture of the defendants right after the holdup. The question was outside the scope of the direct examination and properly overruled.

With respect to the portions of the cross-examination of the witness Brex which were overruled, it is sufficient to say that they were all predicated on a condition of fact the existence of which the witness denied. Brex was asked if Siegel, a state witness, told him that he saw and recognized five people right after the holdup. Brex had detailed the story of the arrest of Boudreau and the subsequent arrest of the other defendants and their identification by Boudreau on

the 15th of October. There was a line-up of men, including the defendants, and Brex was asked if they were identified by anyone else. The witness named three persons, including Siegel. Brex was testifying to what he observed on October 15th and what Siegel may have said to him the preceding summer as to the number of people he then recognized was certainly not germane to the examination-in-chief.

The next point by the same counsel is that the court erred in not permitting Jeanette Sorrensen, a witness for the defendants, to prove that Boudreau had written her a letter in August of 1925 in which he said he took dope. The first difficulty is that the proceedings in the court below were too meagre to raise the question contended for either there or here. What occurred was this: Boudreau had been asked on cross-examination if he had not written a letter to the Sorrensen girl, saying that he was taking too much dope and that he wanted to marry her, to which the witness replied that he did not remember. On the stand the witness was asked this question: *"Q.* You have letters in your possession in which he proposed that—did you ever receive a letter from him in which he proposed?" This was objected to and counsel for the defendants proceeded:

"It is one we are entitled to rebut. I asked him the question on direct, and no objection was made to it, and he denied that he took dope, and he denied that he said to this girl that he took dope in a letter. I say I am entitled to introduce that."

The colloquy then continued:

*"Q.* Did you receive a letter from him in which he—

"Mr. Fisch—I object.

"The Court—Wait until the question is finished.

"Mr. Fisch—Mr. McGeehan is about to give the contents of the letter, or the subject-matter practically, of the contents of the letter.

"The Court—When did you receive the letter?

"Witness—Last August.

"The Court—1926?

"Witness—1925.

"The Court—Sustain the objection."

Efforts were then made by counsel for the defendants to account for the letter as lost. After some further colloquy Mr. McGeehan said: "I will have to complete my endeavor to prove it. I just want to produce secondary evidence of the letter, and if your honor rules that the letter is not admissible, regardless of how I submit it to the court, that it cannot be used to contradict the witness on that point, then I will merely ask an exception."

From the foregoing it is difficult to perceive just what was before the court. There is no offer of proof and the effort to get in evidence the contents of the letter without first apprising the court of those contents would be obviously improper. There was no offer of proof of contents nor was the letter itself offered to the court. Without one or the other it was impossible for the court to determine whether the writing, if proven, would be admissible. The court was quite right, therefore, in refusing to permit the contents to be disclosed in the absence of proof or offer of proof that it had some relevancy to the cause. Apart from this, giving the broadest interpretation to all that was said or intimated, a mere statement in a letter a year before that the witness had taken dope would not be evidential of a habit at that time that might affect his credibility as a witness at the time of trial because of mental impairment any more than if the same letter had contained a statement that he had drunk intoxicating liquor.

The next assignment of error dealt with further questions put to the witness Sorrensen touching the earlier companionship of the witness Boudreau. This assignment has been in substance dealt with in an earlier part of this opinion and is without merit.

The last point concerning the rulings on evidence is that the court improperly permitted a witness, Edward J. Kelley, called by the defendants, to be asked on cross-examination by the prosecutor why he happened to leave the police force, and he answered that he had been dismissed. This ruling calls for no comment. Competent or otherwise, it was not of serious consequence, and affords no ground of reversal.

We now turn to a series of criticisms of the charge of the court. The first six of these are to the court's recital of facts in the charge, appellants claiming that they were incorrect. There is little basis for criticism that the charge did not accurately state the testimony in so far as it was quoted, but even if this were otherwise, it would not avail the appellants, inasmuch as the court with scrupulous care, both during the delivery of the charge and at its conclusion, cautioned the jury that if the court erred in its statement as to any evidence or assumed the existence of any evidence in its statement, or assumed the existence of any evidence that was not actually before the jury, they were to rely upon their own recollection and not upon the recollection of the court. *State* v. *Hummer*, 73 *N. J. L.* 714; *State* v. *Kroll*, 87 *Id.* 330; *State* v. *Kaskevich*, 98 *Id.* 23.

It is next complained that the court erred in unduly stressing the evidence adduced on behalf of the state. An examination of the charge as a whole evinces that this criticism is not justified. There was both recital of the testimony and some comment thereon by the court in its charge. If larger reference was made to some of the testimony adduced by the state it was obviously due to the fact that the state had the affirmative, the burden of proof, and its testimony took a wider range than that produced by the defendants, whose defense was, in addition to a simple denial, the establishment of an alibi which precluded their presence at the time of the crime. We cannot say that the comments of the trial judge were either uncalled for or partial, and reach the conclusion that there is here no ground for reversal.

There are two other complaints respecting the charge. One is that the court improperly defined an alibi and its effect, and the other that the court charged the jury if they believed the defendants' story they should be convicted of murder in the first degree. Neither of these contentions is well founded. The inferences drawn in the appellants' briefs are based upon punctuations, which we think obviously wrong. What the court said respecting the alibi, which is now urged as ground for reversal, was as follows:

"An alibi is a defense arising upon proof that the prisoner was elsewhere at the time the crime was committed, and, consequently, incapable of being the guilty person. If such a defense be overcome by the state or be discarded by a jury, the state will not thereby be relieved of the burden of establishing the guilt of the accused by affirmative evidence which shall satisfy you that he is guilty. If reasonable doubt of guilt is raised even by inconclusive evidence of the alibi, defendant is entitled to the benefit of it. In that event a defense which otherwise would overcome and put at naught the state's evidence would simply be put out of the case."

The law itself respecting alibi was accurately defined, and the jury was told, in effect, that if disproved by the state or the jury did not believe it the alibi would be put out of the case, but parenthetically stating nevertheless that if reasonable doubt of guilt arises even by an inconclusive alibi the defendants were entitled to the benefit of that doubt. The last sentence so obviously refers to a disproof by the state or disbelief by the jury as to preclude all possibility of its application being misunderstood by the jury.

The same is true of the contention that the court told the jury it must convict if it believed the defendants. What the court said was this:

"When I read to you the statute in this case, I pointed out that the crime these men are charged with is murder, and that the statute makes a murder in the perpetration of a robbery to be murder in the first degree. I charge you that in this case your verdict ought to be, if you believe the defendants or any of them, guilty of murder in the first degree."

The jury was, in effect, told that the men were charged with murder, and when that murder is by participation in a robbery it is murder in the first degree, and if they believed the defendants guilty of murder at all it was in the first degree. Slight modification in punctuation in both cases is all that is required to make obvious that which we think is already not doubtful. Mistakes in punctuation do not afford grounds for reversal. 16 *C. J.* 1049, § 2492. That the instruction as delivered must have borne no such con-

struction as contended for is apparent from the fact that none of the counsel for defendants took exception to either of these portions of the charge on the grounds raised, but did except to the last sentence of the charge in that it limited the jury's finding to be either a verdict of not guilty or a verdict of guilty of murder in the first degree without making reference to a recommendation of life imprisonment.

The refusal of the court to entertain as too late in presentation, and the modification or denial of requests to charge are next assigned as error. Those submitted by the defendant Nick Joseph Juliano were late in presentation to the trial judge in that they were handed to the court after the summing up had begun and were refused for that reason. This ruling was within the discretionary power of the court. *State* v. *Littman,* 86 *N. J. L.* 453; *affirmed,* 88 *Id.* 392. It was there held that "to entitle a party to insist that a proper instruction requested by him should be given, a timely presentation of such request should be made to the court at or before the close of the evidence, and before the beginning of the argument, unless the request presented has been made necessary by something the court has already charged or omitted to charge." Citing *Dunne* v. *Jersey City Galvanizing Co.,* 73 *Id.* 586; *Carmony* v. *West Jersey, &c., Railroad Co.,* 78 *Id.* 552. There was nothing in the requests suggested by the charge inasmuch as the court had not yet begun the delivery of its charge to the jury, and we cannot say that there was an abuse of discretion by the trial judge in refusing to entertain the requests.

Our examination, however, of all the propositions of law presented for instruction, including those presented out of time (which were largely duplications of requests on behalf of the other defendants), satisfy us that there was no error committed by the court in dealing with the requested instructions. They were all, in fact, charged in effect so far as the legal propositions contained therein were sound and applicable. It was not the right of the defendants to choose the language in which the court should state to the jury the pertinent instructions to which the defendants were entitled.

It is finally urged with much emphasis that the verdict was against the weight of the evidence and that this court should reverse under the authority of chapter 349 of the laws of 1921. A careful examination of the evidence leads us to the conclusion that this contention is not well founded. The proofs establishing the guilt of the defendants we think admit of no sort of doubt. The story told by Boudreau, while that of an accomplice, bears in its main aspects the impress of truth. Aside from the evidence of Boudreau there was corroboration of the identification of the defendants—the one issue of fact involved in the case—in some cases by more than one witness. The attempt of the defendants to meet the issue thus raised by denial and by proof of an alibi is not convincing; and some of this proof is clearly fabricated. The attempt to cast suspicion upon another group of suggested questionable character consisted wholly of insinuation and innuendo, and actual proof tending to this end was singularly lacking. It would serve no useful purpose to extend this opinion to a review of the testimony of the various witnesses, comprising as it does nearly fifteen hundred pages and consuming nearly three weeks in the trial. While Boudreau was a principal in the robbery, a motive to implicate others in the dilemma in which he was involved is not apparent except upon the theory of truth. From his own story and from that of the police there were no inducements offered him either to make his own confession or to involve others with him. The evidence is that both were the production of his own desire and inclination to tell the story of the crime as it existed. It is difficult to conceive how without gain to himself he would wantonly include the innocent upon any other theory. Beyond all question of doubt Boudreau was himself a party to the crime, present in its execution and aiding therein. It is quite probable that his own confession might have been in a measure prompted in his own mind by the hope of amelioration of punishment to himself. No reward, however, could come to him by implicating the innocent and shielding the guilty. Corroborated as is his testimony that these defendants were the perpetrators with him-

self of this atrocious robbery and murder, we feel constrained to say that the evidence does not leave in our minds any doubt of the appellants' guilt and consequently that the judgments will not be disturbed on this ground.

Finally, it may be said that while in the course of the trial discretionary rulings might in some instances have been made otherwise than they were, it must be borne in mind that a trial lasting three weeks could scarcely be imagined in which minor rulings of debatable character would not creep in, and it must be borne in mind also that not only our own sense of enlightened justice but the mandate of the legislature requires that no reversal should be had upon such grounds unless the defendants have suffered manifest wrong or injury. Criminal Procedure act 1898, section 136. Feeling the responsibility of our judgment both upon the alleged trial errors and upon the weight of the evidence, we reach the conclusion that neither rulings on debatable points nor the result of the verdict on the weight of the evidence afford ground of reversal.

The judgments are therefore, in both cases, affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, VAN BUSKIRK, McGLENNON, KAYS, HETFIELD, DEAR, JJ. 14.

*For reversal*—None.