STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
FREDERICK BUNK, ROBERT JELLISON AND CLAR-
ENCE SMITH, DEFENDANTS-APPELLANTS.

Argued January 3, 1950—Decided April 24, 1950.

See also 73 *A.* 2d 245.

462

464

Mr. *Edward J. Gilhooly* argued the cause for the appellant Bunk, *Mr. James L. McKenna*, attorney.

Mr. *Louis Auerbacher, Jr.*, argued the cause for the appellant Jellison.

Mr. *Edward J. Gilhooly* argued the cause for the appellant Smith.

Mr. *Duane E. Minard, Jr.*, argued the cause for the State, *Mr. James R. Giuliano* and *Mr. C. William Caruso* on the brief.

The opinion of the court was delivered by

OLIPHANT, J. This is defendants' appeal, by virtue of the *Constitution, Art. VI, § V, par.* 1(c) and *Rule* 1:2–1(c), from a judgment entered in the Essex County Court following their conviction by a jury of murder in the first degree without recommendation. The Court, as it was required to do, imposed the death sentence.

The jury, from the evidence adduced, could have found the following facts. Defendants Jellison and Bunk, together with one Yanuzzi who was jointly indicted with these defendants but who had not been apprehended at the time of trial, met on the afternoon of August 7, 1948, at a tavern and proceeded to another tavern where they picked up Smith. All four spent the greater part of the afternoon and evening together visiting various taverns and places in Newark "looking them over" with a view of selecting the most likely place at which to stage a holdup. After midnight they decided to

attempt the holdup of the "Penn Tavern" because few people were there at the time.

Jellison drove the car and parked it a short distance from the tavern with its motor running. The defendants then discussed the plans for executing the robbery and the part each was to take in it. Jellison, according to the plan agreed upon, stayed in the car for the purpose of making the getaway. He owned the guns used in the holdup, which were kept in his car for the purpose of committing robberies.

Smith, Bunk and Yanuzzi, following the plan, entered the tavern. At a signal they drew their guns and Smith went to the shuffleboard room which was separated from the bar room by a partition. Here Peter Newcomb was playing shuffleboard with his brother Frederick. Smith announced it as a holdup, whereupon a scuffle ensued between him and Peter Newcomb during which the latter was shot and killed by a bullet from the 32-caliber gun in the hands of Smith. In the scuffle Smith also was shot and his skull fractured. After the shots in the shuffleboard room eight or ten other shots were fired in the tavern. Following the shooting Bunk and Yanuzzi ran from the tavern to Jellison's parked car and escaped. Smith was taken to the Newark City Hospital, Bunk was arrested in the early morning of August 14th in Newark and Jellison was arrested in the early morning of August 18th in Haverhill, Mass., to which city he had fled.

■ ■ It is asserted it was error on the part of the trial court to have denied a motion for judgment of acquittal at the close of the State's case because the indictment did not comply with *Rule* 2:4–11. The indictment was in the form prescribed by the statute *R. S.* 2:188–11. It was held in *Graves v. State,* 45 *N. J. L.* 347, 357 (*E. & A.* 1883), that an indictment for murder is sufficient if it charges the defendant did wilfully, feloniously and with malice aforethought kill and murder the deceased. Where several defendants are charged with murder as actual participants in a robbery during which the killing was perpetrated, an indictment charging murder in the language of the statute is sufficient, without

charging the defendants as principals or as accessories, and without setting forth the robbery as part of the crime. *State v. Juliano*, 103 *N. J. L.* 663 (*E. & A.* 1927).

■ *Rule* 2:4–11 provides "The indictment or accusation shall be a written statement of the essential facts constituting the offense charged" and is merely directory. The defendants could not possibly have been misled or prejudiced in maintaining their defenses by the form of the indictment. If they had not considered it specific enough to properly prepare their defenses, bills of particulars could have been applied for. *Rule* 2:4–14.

Each defendant claims error because the trial court, when jurors were being examined on their *voir dire*, made an alleged erroneous statement of the law: that if deceased was killed by a third person, not acting in concert or having any connections with defendants, nevertheless they would be guilty of murder in the first degree.

We are not called upon to determine this legal proposition but to consider, assuming that the remarks of the trial judge were an erroneous exposition of the law, whether or not the statement constituted reversible error.

Defendants argue that the remarks of the trial judge, stated numerous times in the presence of the jury and the panel, were so gravely prejudicial and so completely infected the atmosphere of the whole trial that they could not be cured by a proper charge.

When objection was made to the complained of remarks the Court said, "I am making no ruling on that point now," and "The jury, when we finally get a jury, will decide the case, as far as the law is concerned, as I give the law to them," and "I will allow the State to put the question in the form of its contention. I do not feel called upon to instruct the jury now what the law is. I will do it at the proper time."

■ Even if the Court's view of the law as it was expressed in the examination of jurors on their *voir dire* was erroneous it was cured by the express withdrawal of those remarks in its charge to the jury, *State v. Parks*, 96 *N. J. L.* 360 (*Sup.*

*Ct.* 1921); *State v. Vliet,* 120 *N. J. L.* 23 (*Sup. Ct.* 1938); where it said:

"During the drawing of this jury and while some of you were in the box and while some others of you were in the court room a legal argument between counsel and the Court took place. At that time I expressed the view if during the course of this attempted robbery a third person, such as a patron of the tavern, drew a gun or used a gun to aid in repulsing the robbers and in doing so accidentally killed another person, the persons attempting the robbery would be guilty of murder in the first degree for that killing.

"Since that time my further study of this statute and of the law has convinced me that the view I then expressed was an erroneous view. Consequently, in order to avoid any possible misunderstanding on the subject, I expressly withdraw that assertion and instruct those of you who heard it to disregard it.

"If the killing of Peter Newcomb came about through the firing of a shot by a third person in resisting the attempt at robbery and that third person had no connection with these defendants, then under the statute they are not guilty under the indictment and must be acquitted."

We cannot agree that the minds of the jurors had become so saturated with the alleged erroneous legal rule that it could not be eradicated therefrom under the circumstances exhibited here, or that by the remarks there was any prejudice to the defendants in maintaining their defenses on the merits.

 Smith also asserts there was error committed in the impanelling of the jury in that in the *voir dire* examinations the State was permitted to ask questions to elicit information as to whether the prospective juror would return a first degree murder verdict if the facts showed the killing was done in attempting to commit robbery, and whether the juror would be dissuaded in bringing in such a verdict if he knew the penalty would be death. The contention is made such questions excluded the fact the jury might recommend life imprisonment.

A wide latitude is allowed counsel in examining on the *voir dire* and the State was well within its rights. It had a right to ask for the death penalty and to inquire as to a prospective juror's attitude respecting the imposition of that penalty; to contend that upon the evidence it expected to produce that

the crime was of such atrocity the jurors' verdict should be without recommendation. *State v. Juliano, supra; State v. Favorito,* 115 *N. J. L.* 197 (*E. & A.* 1935). There was no error here.

 Was there, as contended, prejudicial error in permitting Dr. Berardinelli, the Assistant Medical Examiner of Essex County, to express an opinion as to the caliber of the bullet by which the State contended the deceased was killed? We think not. He was examined by the Court in addition to being examined by counsel as to his qualifications. Who is entitled to be qualified as an expert concerning a question of science or skill cannot be determined by any precise rule. It must be left largely to the discretion of the trial judge to be determined by him from the facts and the nature of the case. His decision is conclusive unless shown to be erroneous as a matter of law. *New Jersey Zinc Co. v. Lehigh,* 59 *N. J. L.* 189 (*E. & A.* 1896). The evidence admitted was well within the Court's discretion.

 From all the evidence we find the Court was justified in admitting the confessions of all the defendants. We are satisfied the evidence was amply sufficient to support the finding of the trial court that they were voluntarily made and not extorted by threats of violence or by any direct or implied promise relating to some benefit to be derived by the accused in the criminal prosecution. In determining the admissibility of a statement or confession made by an accused the test is whether or not it was voluntarily made, *Roesel v. State,* 62 *N. J. L.* 216 (*E. & A.* 1898); *State v. Pierce,* 4 *N. J.* 252 (1950), and the decision of the trial court on this question will not, as a rule, be disturbed on appeal when there is sufficient evidence to support it. *State v. Cole,* 136 *N. J. L.* 606 (*E. & A.* 1947); *State v. Pierce, supra.* While Bunk and Jellison claim they were threatened, beaten, questioned unremittingly and were not advised of their constitutional rights, they were uncorroborated and such evidence was negatived by other proofs. Opportunity was afforded them when they confessed to complain of their treatment. A disinterested

impartial citizen was present and in answer to his question Bunk stated he had been treated "all right," Jellison said "very good." Both said their statements were voluntarily made without threats or promises and that they signed them voluntarily.

In answer to the argument that the defendants were not advised of their rights and privileges the law over the years in this State has been that a person is only entitled to counsel to aid him in his defense, not to save him from his own voluntary acts, *State v. Murphy,* 87 *N. J. L.* 515 (*E. & A.* 1915); *State v. Cole, supra,* and such cautionary instructions are not an essential step in the establishment of the fact that a confession is voluntary. *State v. Hernia,* 68 *N. J. L.* 299 (*E. & A.* 1902); *State v. Cole, supra; State v. Pierce, supra.*

When the jury considered the confessions it had before it all the facts relating thereto and it could have believed them or rejected them as it saw fit. While the Court passed on their competency, as it was required to do, the jury passed on their credibility and under the charge of the court went even further and determined their voluntariness, an advantage to the defendants the law does not bestow. *State v. Foulds,* 127 *N. J. L.* 336 (*E. & A.* 1941); *State v. Cole, supra.*

Defendants rely on *Watts v. Indiana,* 338 *U. S.* 49, 93 *L. Ed.* 1434, 69 *Sup. Ct.* 1347; *Harris v. South Carolina,* 338 *U. S.* 68, 93 *L. Ed.* 1440, 69 *Sup. Ct.* 1354; *Turner v. Pennsylvania,* 338 *U. S.* 62, 93 *L. Ed.* 1443, 69 *Sup. Ct.* 1352; and *State v. Cooper,* 2 *N. J.* 540 (*Sup. Ct.* 1949), in asserting there was a denial of due process because of "fundamental unfairness" and the alleged involuntariness of the confessions. Those cases were decided on the particular facts exhibited in each, as the instant one must be. In those United States Supreme Court cases the holdings were based on lack of due process on the uncontroverted facts and, as was said in *Watts v. Indiana, supra:*

"In all the cases that have come here during the last decade from the courts of the various states, in which it was claimed that the

admission of coerced confessions vitiated convictions for murder there has been complete agreement that any conflict in testimony as to what actually led to a contested confession is not this Court's concern. Such conflict comes here authoritatively resolved by the State's adjudication. Therefore only those elements of the events and circumstances in which a confession was involved that are unquestioned in the State's version of what happened are relevant to the constitutional issue here."

The Supreme Court in *Lyons v. Okla.*, 322 *U. S.* 596, 84 *L. Ed.* 1481, 64 *Sup. Ct.* 1208, following its holding in *Lisenba v. California*, 314 *U. S.* 219, 68 *L. Ed.* 166, 62 *Sup. Ct.* 280, said that only when conceded facts exist which are irreconcilable with mental freedom, regardless of the contrary conclusions of the triers of the facts, would it assume the responsibility of deciding against the findings of the state courts involving "due process" under the Fourteenth Amendment of the Federal Constitution.

We said in *State v. Cooper, supra,* "It cannot be doubted that a confession induced by physical or moral compulsion, whatever its nature, has no evidential efficacy;" and we reaffirm that principle, but we also reaffirm the principle that a confession freely and voluntarily given and not induced by hope or fear or other consideration leading to the substitution of something else than the truth is admissible in evidence.

True, these confessions were made after arrest without warrant and prior to arraignment. Smith confessed August 10th and was arraigned August 24th after having been discharged from the hospital. Bunk was arrested August 14th, confessed August 16th and was arraigned August 23rd, while Jellison was arrested August 18th, confessed August 19th and was arraigned August 23rd. There was no protracted or unremitting interrogation. It has never been held, except in *Upshaw v. United States,* 335 *U. S.* 410, 93 *L. Ed.* 129, 69 *Sup. Ct.* 170, that a confession obtained during an illegal detention, i. e., without taking the prisoner before a magistrate immediately or with reasonable dispatch, is inadmissible for that reason alone regardless of its voluntariness. That case involved the violation of a *Federal Rule of Criminal Procedure,*

*Rule* 5(a), 18 *U. S. C. A.,* not a state rule or statute. That decision was by a 5-4 vote of the Court, the majority following their construction of the decision of that Court in the *McNabb case, 318 U. S. 332, 87 L. Ed. 819, 63 Sup. Ct. 603.* Four justices, in a lengthy dissent, felt that the *McNabb case* was not authority for such a holding and held a confession obtained during illegal restraint should not be invalidated solely for that reason. Mr. Justice Reed for minority said:

"If confessions obtained during unlawful detention are not excluded by the fact of unlawful detention alone, the constitutionally guaranteed rights of the accused are nevertheless protected by the rule that no involuntary confession is admissible. It is therefore unnecessary for constitutional reasons to extend this protection to evidence obtained through violation of a statute or a rule of criminal procedure by those to whom the confession is made. In criminal trials, the method of obtaining evidence has never been a reason for barring its use except where constitutional rights were violated."

██ ██ The arrests and arraignments of these defendants occurred before the effective date of our new rules, but giving full force to *Rule* 2:3–3, which provides that an accused be arraigned before the nearest magistrate without unnecessary delay, a statement or confession made by the accused is not *ipso facto* inadmissible solely by reason of the violation of that procedural rule. The test still remains, was the statement or confession voluntarily made? *State v. Pierce, supra.* Neither does the failure to follow the rule violate due process under the Fourteenth Amendment of the Federal Constitution even though it might be a violation of due process under the Fifth Amendment and the federal implementing statutes and rules applicable to criminal proceedings in the United States Courts.

Jellison contended at the trial that on the night of the murder he suffered from a syncope or blackout spell and that he was unable to distinguish between right and wrong or to know the nature and consequence of his acts, and he complains the trial judge erred in that portion of his charge dealing with the defense of insanity and of his refusal to charge a specific request relating thereto.

Notwithstanding the fact that defendant's neurologist testified he could give no opinion as to whether or not defendant could distinguish between right and wrong at the time of the commission of the crime and that the condition of the defendant was not one which is medically described as insanity, a request to charge in the following language was submitted:

"If you find that because of a pre-existing mental, physical or neurological condition the defendant Robert K. Jellison prior to the commission of the alleged crime was rendered unable to form an intent or design to commit a robbery or a killing or incapable of deliberating on such a design, or incapable of appreciating the nature or consequence of his act or to distinguish between right and wrong, then he must be acquitted."

The trial judge, although refusing to charge the request, gave a lengthy, adequate and complete charge with respect to the doctrine of insanity as well as covering any implications which might be properly inferable from the type of disease defendant claimed he was suffering from.

The charge need not be in the exact language requested and there is no error if the subject matter of the request be charged and fully covered by the court. *State v. Juliano, supra; State v. Tansimore*, 3 *N. J.* 516 (1950).

Defendant extracts two short sentences from the entire charge on insanity, and asserts error thereby in that the court stated that temporary insanity was not a defense. Those sentences read as follows: "The law regards insanity as a disease of the mind implying fixedness and continuance of mental condition. It therefore rejects the doctrine of what is called emotional insanity, which begins on the eve of the criminal act and ends when it is consummated."

One or two short sentences may not be extracted from a charge and construed without regard to the context of the entire charge. *State v. Banusik*, 84 *N. J. L.* 640 (*E. & A.* 1906); *State v. Tachen*, 92 *N. J. L.* 269 (*Sup. Ct.* 1919); affirmed, 93 *N. J. L.* 485 (*E. & A.* 1919); *State v. Tansimore, supra.*

Certain sentences in a charge taken alone may need some amplification to render them accurate and if such amplifica-

tion be given in the context so that the jury cannot be misled, there is no error justifying reversal. *State v. Frank,* 90 *N. J. L.* 78 *(Sup. Ct.* 1917); affirmed, 91 *N. J. L.* 718 *(E. & A.* 1918); *State v. Tansimore, supra.*

Although in the case of *State v. Lynch,* 130 *N. J. L.* 253 *(E. & A.* 1943), a charge containing precisely the same wording, when coupled with a denial by the trial judge of a request to charge that insanity was a defense, whether it be of a temporary or permanent character, was held to be error, the trial judge here plainly indicated elsewhere in his charge that if by reason of any mental condition the defendant was rendered incapable of distinguishing between right and wrong at the time of the commission of the crime he should be acquitted. The error in the *Lynch case* was that the trial court did not recognize insanity as a legal defense. The opinion in that case holds: "If, at the time of the shooting, the accused, by reason of temporary insanity, was incapable of distinguishing between right and wrong with respect to the act, he is not guilty of murder. Unless he was conscious that it was an act which he ought not to do, there was a lack of moral or criminal responsibility."

Here the trial judge included the following in his charge: "If you find that on the night of this alleged crime Jellison suffered a blackout or *sequela* or after effects that so prostrated his mental faculties as to render him mentally incapable of forming an intention to commit a robbery, then he should be acquitted, unless you find beyond a reasonable doubt that he had his faculties or recovered his faculties prior to the time when the execution of the plan to rob began and gave his consent thereto."

It is apparent that the error found in the *Lynch case* is not present here and we find no error in the respects complained of.

Jellison further claims there was error in the refusal of the trial court to charge a request submitted by him defining murder in the second degree. Clearly there was no error in such refusal since, under the facts and the theory upon which the case was tried, the defendant was either guilty of

murder in the first degree or was not guilty of any homicide whatever, and this is precisely what was charged.

Defendant Bunk says the trial judge erred in denying certain requests to charge as submitted by him, the gist of them being that the jury must come to an unanimous conclusion as to whether a defendant is to suffer the death penalty.

Instead of complying with the requests the Court charged: "The Court has no power and no right to make any comment or offer any advice with respect to the recommendation contemplated by the statute. The matter rests entirely and solely in your judgment and in your discretion after a consideration of all the evidence."

The question presented here was raised in *State v. Cordasco*, 2 *N. J.* 189 (*Sup. Ct.* 1949), though in that case there was no request to charge as there was here. In that case we said, in language taken largely from *State v. Molnar*, 133 *N. J. L.* 327 (*E. & A.* 1945):

"The character of the sentence is not an issue for trial. The issue is guilt or innocence and, as always, only proof relevant to that issue is admissible. The statutory punishment for first degree murder is death, subject only to the condition that the jury in its absolute discretion chooses to recommend imprisonment at hard labor for life; a recommendation that shall not be made, however, except after consideration of all of the evidence and by incorporating the recommendation in the verdict of guilt. If that condition does not arise, the penalty is death, determined not by the jury, but by the statute, and pronounced by the court. It is not correct to say that the jury imposes the sentence of death where it does not choose to make the recommendation for life imprisonment; just as it would not be correct to say that the Court of Pardons imposes a death penalty merely because it does not grant a pardon or commutation."

And

"It is fundamental and of common knowledge that verdicts in criminal cases must be determined by unanimous vote."

The penalty imposed for murder in the first degree is death, *R. S.* 2:138–4, and when a verdict is returned it is assumed it is the unanimous vote of the jury. If there is any doubt of this it can always be verified by polling the jury, as was

done in this case, in which procedure each respective juror answers in his own right and assumes the responsibility and correctness of the verdict. Following our procedure, therefore, the Legislature having provided the penalty for the crime that penalty naturally follows upon the rendition of the verdict of guilty. Again, under the statute, if the jury decides to give clemency to the defendant to the limited extent permitted by the statute they can by their verdict attach such a recommendation. Before that recommendation can be attached it must be agreed upon unanimously by the jury or else it does not become effective. In other words, the purpose of the jury is to determine guilt, the punishment being fixed by legislative enactment, and that punishment must be imposed unless the jury by their verdict make a contrary disposition. Before that contrary disposition can be made it must be agreed upon by the jury unanimously or else the death penalty attaches. We therefore see no error in the court's charge in this respect.

There is an abundance of proof to support the verdict and nothing in the record to make the verdict appear to be against the weight of the evidence so as to give rise to an inference that it was the result of passion, prejudice or partiality. *State v. Hauptmann,* 115 *N. J. L.* 412 (*E. & A.* 1935); *State v. Cole, supra; State v. Cordasco, supra.*

We have carefully examined the other points raised but find them without merit and not of sufficient substance to require discussion.

Perceiving no error, the judgment under review is affirmed.

The handing down of this opinion was postponed pending determination of defendants' motion for a new trial on the ground of newly discovered evidence and the decision on the appeal therefrom, which is set forth in an opinion filed as of even date herewith.

HEHER, J. (dissenting). I find error in the refusal to charge, as requested by the defendant Bunk, that there could not be an unqualified verdict of murder in the first degree

unless the jury were unanimous on guilt and capital punishment.

It is the absolute right of the accused in a criminal case to have the jury distinctly instructed on a principle of law material to the issue; and a refusal to charge a specific request embodying the principle is reversible error unless the subject matter has been charged in substance. *State v. De Geralmo*, 83 *N. J. L.* 135 (*Sup. Ct.* 1912) ; *Slate v. Barone*, 96 *N. J. L.* 417 (*Sup. Ct.* 1921) ; *State v. Genese*, 102 *N. J. L.* 134 (*E. & A.* 1925) ; *Slate v. Haines*, 103 *N. J. L.* 534 (*Sup. Ct.* 1927) ; *State v. Larsen*, 105 *N. J. L.* 266 (*Sup. Ct.* 1929) ; *State v. Rusnak*, 108 *N. J. L.* 84 (*E. & A.* 1931) ; *Slate v. Capawanna*, 118 *N. J. L.* 429 (*Sup. Ct.* 1937) ; affirmed, 119 *N. J. L.* 337 (*E. & A.* 1938) ; *Stale v. Gregory*, 120 *N. J. L.* 326 (*Sup. Cl.* 1938). The right to "a distinct charge" on matters pertinent to the inquiry becomes fixed when a timely request is interposed. "One of the most important duties of the court is to declare the law applicable to a case to the jury when requested so to do. This should be done in such a way as not to leave room for misapprehension or mistake." *Roe v. State*, 45 *N. J. L.* 49 (*Sup. Ct.* 1883).

It would seem to be fundamental in the statute that there be unanimity both as to guilt and punishment before a verdict of murder in the first degree can be returned by the jury. The legislative purpose plainly was to assign to the jury the determination of the question of which of the alternative punishments should be exacted where guilt is established, and thus to temper the strictness and severity of the old law. It would not be a realistic appraisal of the statute so to construe the expression as to permit a finding of murder in the first degree to stand, unmodified by a recommendation of life imprisonment and so sufficient to sustain a judgment of death, where the jury are divided on the issue of punishment. The principle of the mandatory death sentence was abandoned in 1916. *P. L., p.* 576, *c.* 270. Following the decision of the old Court of Errors and Appeals in *State v. Marlin*, 92 *N. J.*

*L.* 436 (*E. & A.* 1919), the Act was amended to provide the death penalty for murder in the first degree "unless the jury shall by its verdict, and as a part thereof, upon and after the consideration of all the evidence," recommend life imprisonment, in which case life imprisonment is mandatory. *P. L.* 1919, *p.* 303, *c.* 134; now *R. S.* 2:138–4. The obvious policy of the statute is action by the jury on an issue of the utmost gravity. The jury are made the final arbiters of the punishment. There is no requirement in specific terms of unanimity on both guilt and punishment before a verdict can be rendered; neither is there a suggestion in the language that a finding of guilt shall entail capital punishment if the jury be not unanimous on the alleviation of the penalty. Under the original act, the jury were vested with an arbitrary discretion; under the amendment, the jury exercise judgment and discretion based on the evidence. *State v. Cooper,* 2 *N. J.* 540 (1949). The remission of the death penalty is a function committed to the jury. Their action is made known by the form and content of the verdict—remission by a recommendation of life imprisonment; the contrary by a failure of such recommendation. The choice is the jury's; but a choice there must be, and the action must be unanimous.

The requirement of unanimity in jury verdicts in criminal cases is as ancient as the institution itself; and a construction that would sustain a finding of first-degree murder as a verdict calling for the death sentence, where there was a want of unanimity in the jury as to the punishment, is on the plainest principles insupportable unless that purpose is expressed in clear and unambiguous terms. In the normal course, unanimity is the rule as to all matters within the jury's province. As said by Mr. Justice Reed in a case involving a similar federal statute: "A verdict embodies in a single finding the conclusions by the jury upon all the questions submitted to it." *Andres v. United States,* 333 *U. S.* 740, 68 *S. Ct.* 880, 92 *L. Ed.* 1055 (1947). There, the Court unanimously ruled that the statute required unanimity in the jury both as to guilt and punishment. The common-law

attribute of unanimity in the verdict of a jury in criminal cases was reaffirmed and secured by Article I, paragraph 9 of the Constitution of 1947. See *American Publishing Co. v. Fisher,* 166 *U. S.* 464, 17 *S. Ct.* 618, 41 *L. Ed.* 1079 (1897); *State v. Gerry,* 68 *N. H.* 495, 38 *A.* 272 (1896); also, 24 *L. R. A.* 272, 43 *L. R. A.* 78.

Is not the question of punishment, involving as it does the power of life and death, so intimately identified by the statute with the basic issue of guilt as to constitute an integral part of that issue which must be resolved before a verdict can be returned? Can it be that the Legislature intended that unanimity as to guilt is sufficient to sustain the death sentence, even though all but one of the jurors had concurred in a recommendation of life imprisonment? Surely, under the statute a juror could refuse concurrence in a verdict of guilty, without qualification, if convinced that the death sentence should not be imposed. It would seem to be of the essence of the statutory policy that a juror considering the issue of guilt should not be "influenced consciously or unconsciously by knowledge that the finding of guilt of the crime charged will entail a mandatory penalty which in his opinion is not justified by the degree of moral guilt of the accused. Each juror should now know that the finding of guilt does not carry that mandatory penalty unless the jury fails to make a recommendation of life imprisonment a part of the verdict and each juror should know that he is one of the twelve judges who shall decide what the verdict shall be in all its parts. Until the twelve judges have agreed on every part of the verdict, they have not agreed on any verdict." *People v. Hicks,* 287 *N. Y.* 165, 38 *N. E.* 2d 482, 138 *A. L. R.* 1222 (1941). The phrase "as a part of its verdict" was deemed significant of this purpose. Judge Lehman continued: "The trial court has read into the statute by implication a proviso that a jury must *first* agree upon a *verdict* of guilty, which will have the effect of condemning the accused to death and then may recommend life imprisonment as part of the verdict only if *all* the jurors agree to recommend life imprisonment. That is not justified

by the language of the statute and would in large measure defeat its plain purpose. Under that construction a jury still must face the choice of condemning the defendant to death or letting him go free unless all twelve jurors thereafter agree upon a recommendation of clemency. That construction ignores the fact that the choice whether a recommendation of life imprisonment should or should not be a part of the verdict is left to the *jury* and the verdict is incomplete until all have agreed. That construction assumes that the Legislature has confided to a single juror the choice of life or death for an accused." New York's statute is like ours. So is Mississippi's. The Supreme Court there said: "The province of the jury as to their verdict is entire, and they should agree both as to the guilt or innocence of the accused and as to the penalty, if he is guilty." *Green v. State,* 55 *Miss.* 454 (1877).

It may be conceded that the legislative language is not so explicit as to be unambiguous; but doubts as to meaning do not linger when consideration is given to the general policy of making the punishment subject to the discretion of the jury rather than the absolute rule of the prior statute which applied the death penalty in every case regardless of palliating circumstances. The new rule embodies the fruits of experience. Miscarriages of justice due to the inexorable decree of the statute were all too frequent. Penal statutes are to be strictly construed against the State; *e converso,* a statute such as this is to be broadly interpreted in favor of the accused. In the *Andres case,* Mr. Justice Reed said: "In death cases doubts such as those presented here should be resolved in favor of the accused." There should not be a grudging and reluctant concession to the new policy designed to substitute in the matter of punishment the humane impulses and promptings of the jury that heard the evidence and determined the issue of guilt for the unvarying rule of the old law. The wisdom of the policy is peculiarly a legislative province.

The charge did not convey to the jury the rule of the statute as thus construed. Indeed, the Judge made no mention of

this phase of the act. After stating the provision, he declared that he had "no power and no right to make any comment or offer any advice with respect to the recommendation contemplated by this statute. That matter rests entirely and solely in your judgment and in your discretion, after a consideration of all the evidence." It is clear the Judge had a different conception of the statutory rule. If the provision be read as I conceive it, then the error is conspicuous. The accused was entitled to specific instructions that would make certain the jury's comprehension of the sense and precise meaning of the act. In the *Andres case,* Mr. Justice Frankfurter said of the function of the charge: "No part of the conduct of a criminal trial lays a heavier task upon the presiding judge. The charge is that part of the whole trial which probably exercises the weightiest influence upon the jurors. It should guide their understanding after jurors have been subjected to confusion and deflection from the relevant by the stiff partisanship of counsel."

I would reverse the judgment and award a *venire de novo* to each defendant.

I join in the holding that the subsequent motion for a new trial for newly discovered evidence was not sustained by the proofs.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD and BURLING—5.

*For reversal*—Justice HEHER—1.