139 So.2d 408 (1962)
Sie DAWSON, Appellant,
v.
STATE of Florida, Appellee.
No. 31380.
Supreme Court of Florida.
March 23, 1962.
Rehearing Denied April 17, 1962.
*409 E.P. Gregory of Gregory & Towles, Quincy, for appellant.
Richard W. Ervin, Atty. Gen., and B. Clarke Nichols, Asst. Atty. Gen., for appellee.
O'CONNELL, Justice.
Sie Dawson was convicted and sentenced to death for the murder of Roger Glenn Clayton, a two year old boy.
On this appeal appellant's only contention is that a confession made by him, but repudiated at the trial, was not made freely and voluntarily. More specifically he contends that the confession was obtained from him after an unduly long and protracted period of interrogation and was *410 made while he was under the influence of fear or apprehension of personal violence.
The validity of the confession is all important in this case. In its brief the State concedes that "the sole basis for this conviction is the confession obtained from the appellant."
At about eight o'clock on the morning of Thursday, April 14, 1960, the father of the deceased child, in the company of two other persons, found the family station wagon in a wooded area near Chattahoochee in Gadsden County, Florida. In the station wagon there was found the body of Roger Glenn Clayton, the body of the mother of the child, and a four year old brother of the deceased child who was alive but suffering from head injuries. Mrs. Clayton and the children had been missing from their home since the morning of the preceding day.
Appellant, who had worked for the Claytons for some nine years and was living near their home, was arrested by a constable shortly after the discovery of the station wagon and its contents and was taken to the scene of the crime.
In turn the appellant was taken to Quincy and surrendered to a Florida Highway Patrolman who drove him to the Leon County Jail, arriving there at about ten o'clock in the morning. Appellant was thereafter driven to the State Prison at Raiford, arriving there at about midnight. It does not appear that appellant was interrogated on this day.
The next morning the State Attorney of the Second Judicial Circuit and Gadsden County Deputy Sheriff Martin interrogated appellant at Raiford. According to appellant the total time involved in this interrogation did not exceed thirty minutes.
Appellant was then carried from Raiford to Perry, Florida, where he remained in the Taylor County Jail from 2 P.M. until about 10 P.M., at which time he was carried to the Leon County Jail in Tallahassee, Florida.
Appellant, on arrival in Tallahassee, was subjected, with his consent, to a lie detector test which was conducted by Mr. Lester Thompson, an employee of the Florida Sheriffs' Bureau. According to appellant the period of time involved in this examination was three to four hours. Appellant was placed in the Leon County Jail at about 3 A.M. on Saturday morning, April 16th.
Later the same morning, during daylight hours, appellant was given another lie detector test. Appellant testified that it lasted about four hours. The State's witnesses said it lasted about two hours.
In the afternoon of the same day Deputy Sheriff Martin interrogated appellant three to four hours.
There is dispute and confusion as to the number of times that the appellant was interrogated after Saturday and up to and including Wednesday, April 20th, when he made a confession in the presence of the State Attorney, the Sheriff of Gadsden County and a secretary to the State Attorney. However, when all the testimony is reconciled in the light most favorable to appellant it seems clear that he was not interrogated on Sunday, but was interrogated by Deputy Sheriff Martin for three to four hours on Monday, Tuesday and Wednesday and was again given a lie detector test on either Monday or Tuesday, which test lasted four hours according to appellant, two hours according to the State.
After he had completed his confession appellant agreed to and did go with the State Attorney, the Gadsden County Sheriff, and Deputy Sheriff Martin to the scene of the crime and again repeated his confession, pointing out where the station wagon had been parked and other factors relating to the crime.
Twelve days later he was given another lie detector test. During this test, which he testified lasted about four and one half hours, appellant again repeated his confession. *411 He did not testify that he had been interrogated during the twelve days between his first confession and his repeating it on the occasion of this last lie detector test.
On arraignment appellant repudiated his confession by pleading not guilty. At the trial he denied that the confession was his, contending that he said only what Deputy Sheriff Martin told him to say.
As above outlined, accepting in each instance the appellant's testimony as to his interrogations, the record shows that over the period of seven days and six nights (including the day of his arrest) he was interrogated a maximum of about 28 hours, an average of some four hours per day. He was interrogated only once at night and the longest period of questioning on any one day did not exceed eight hours.
Appellant argues that under these facts his confession was not free and voluntary. He compares his case to the case of Chambers v. State, 1936, 123 Fla. 734, 167 So. 697, in which this Court held that the confessions there involved were not free and voluntary where they were made after repeated and persistent questioning at frequent intervals over a period of a week culminating in an all night session of interrogations.
Were the facts in this case equal to those in the Chambers case, supra, we would hold the confession to be invalid, but there is no real similarity between the two cases.
Our conclusion that the interrogation in this case was not so long or protracted as to exhaust his resistance or destroy his will is reinforced by the fact that appellant repeated his confession at the scene of the crime and again 12 days later when he took the last lie detector test.
Too, it is to be noted that appellant did not testify that those who interrogated him and held him in custody abused him in any way or were guilty of misconduct of any kind, except for his claim that he was placed in fear of mob violence throughout the interrogations. We will deal with this point later.
We reject appellant's contention that the confession was not voluntary because it was obtained only after long and protracted interrogation. This Court is committed to the rule that a confession is not vitiated by the fact that it was made while in custody after interrogation, provided the questioning was orderly and properly conducted. Williams v. State, 1945, 156 Fla. 300, 22 So.2d 821. See also Chambers v. State, 1939, 136 Fla. 568, 187 So. 156, reversed 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716.
In support of his contention that he was at all times under the influence of fear or apprehension of violence at the hands of a mob, the appellant testified that immediately after he was arrested and taken to the scene of the crime Deputy Sheriff Martin said in appellant's presence that they had better get appellant away from there before a mob got him. However, there is no testimony that those at the murder scene showed any interest in or animosity toward the appellant.
Appellant testified that shortly after he was arrested and as he was being carried from the scene of the crime he heard Deputy Sheriff Martin radio the Florida Highway Patrol and ask that a car meet them and take appellant to Tallahassee; when the Highway Patrolman took defendant into his car he told him "not to sit up in the car before I get to Tallahassee," as it was likely that the mob might get him; after he had been several hours in the Leon County Jail the jailer told him they had to get him out so the mob could not get him; after which he was slipped out the back door, put in an automobile and told to lie down so the mob would not take him before they got away; Deputy Sheriff Martin told him "he was tired of running up and down the road and if I didn't go ahead on and confess, he wasn't gonna keep on riding *412 up and down the road, he'd rather the mob get me than to get him"; the operator who gave him the lie detector test repeatedly told him his life was "not worth a penny" and threatened to turn him over to the mob; and that Deputy Sheriff Martin threatened to turn him over to the mob on every occasion that he questioned him, including the interrogation just prior to his confession, and again made such threats after his confession on Wednesday, April 20th.
Appellant testified that he confessed because "I was looking for them to get me at any time and I was scared if I didn't" that the deputy would turn him over to the mob. He testified that he "confessed" only to what Deputy Martin told him to say.
However, appellant made no claim that any of the three persons present when he made his confession, i.e. the Sheriff, the State Attorney, and the State Attorney's secretary, threatened him in any way, but in fact testified that they did not do so.
All of the appellant's testimony regarding threats of turning him over to a mob were controverted by the State's witnesses. Essentially the only testimony not controverted was that which dealt with his being told to lie down in the car during the trips from Quincy to Tallahassee and from Tallahassee to Raiford, his being shuttled from jail to jail, the alleged statement of Deputy Sheriff Martin when he called the Highway Patrol, and the alleged statements of the Leon County jailer as to the reason for moving appellant to Raiford.
Had these statements and actions immediately preceded appellant's confession there would be greater force to his contention that the confession was prompted by fear. However, the record shows that more than five days elapsed between these statements and actions during which period of time appellant stoutly maintained his innocence.
In view of these circumstances we think the trial judge was correct in determining that the uncontroverted facts which might bear on the voluntariness of appellant's confession were not such as to dictate a legal conclusion that the confession was involuntary.
The trial judge properly submitted to the jury the determination of the validity of the confession. It was the function of the jury to resolve the conflicts in the evidence relating to the threats allegedly made toward appellant to obtain his confession. The jury, unfortunately for appellant, apparently believed the testimony of the State's witnesses as it had the right to do. We are unable to discover any error in their decision.
We therefore must reject appellant's contention that his confession was invalid because made under influence of fear or apprehension of violence at the hands of a mob.
As pointed out above, the State concedes that the sole basis for the defendant's conviction was his confession. Although defendant did not raise the point or question the sufficiency of the evidence, the State, recognizing our responsibility under Sec. 924.32 F.S.A., raised and argued the question in its brief.
An extrajudicial confession of guilt, standing alone, will not support a conviction on a criminal charge. Independent proof of the corpus delicti is required. Tucker v. State, 1912, 64 Fla. 518, 59 So. 941; Frazier v. State, Fla. 1958, 107 So.2d 16; Alexander v. State, Fla.App. 1958, 107 So.2d 261.
The corpus delicti in homicide cases consists of (1) the fact of death and (2) the existence of the criminal agency of another as the cause of death, connected with (3) the identity of the deceased. Brooks v. State, Fla. 1960, 117 So.2d 482.
Prior to introduction of appellant's confession into evidence it had been clearly established that Roger Glenn Clayton had met his death as the result of blows to *413 his head. These blows had been delivered by a blunt instrument which caused a caving in of the skull. This evidence was sufficient to establish the corpus delicti.
In his confession appellant in substance stated that on the morning of the crime, April 13, 1960, he went with Mrs. Clayton and her two children in the station wagon to the place of the crime; he and Mrs. Clayton drank whiskey; an argument ensued; he got in the driver's seat and attempted to drive the station wagon out; Mrs. Clayton, who was sitting in the seat behind him, threw a hammer at him; the hammer missed him and fell to the floor and as he reached down to get it Mrs. Clayton grabbed him by the collar; he turned and struck her; and that "the children wasn't even hit at with the hammer, not intending to be hit, they got theirs with an accident." At one point in his confession he stated that he did not intend to hit her with the hammer.
The essential element of premeditation immediately becomes significant. In this case premeditation must either be established through the confession or in the physical evidence found in the circumstances at the scene of the crime. The confession indicates that appellant struck Mrs. Clayton in a quarrel or struggle and that there was no intention to strike or harm Roger Glenn Clayton.
It matters not that the death of Roger Glenn Clayton was unintentional if the acts which produced his death were the result of a premeditated design to effect the death of any human being. Hall v. State, 1915, 70 Fla. 48, 69 So. 692.
Premeditation may be inferred from the circumstances just as other inferences of fact may be drawn by the jury. Parker v. State, 1940, 142 Fla. 210, 194 So. 484; Crawford v. State, 1941, 146 Fla. 729, 1 So.2d 713; Robinson v. State, 1941, 148 Fla. 153, 3 So.2d 804.
In this case we think the circumstances were more than adequate to support an inference of premeditation.
According to appellant's confession Mrs. Clayton threw a hammer at him but he was not struck by it. There is no evidence to indicate that she was armed in any way or that she pursued the encounter beyond grabbing appellant by the collar. He was in the front seat of the station wagon, she in the seat behind him. When found Mrs. Clayton was lying in the back seat with one arm upraised over her head. The medical evidence showed that she had suffered not one blow, but multiple cerebral contusions and skull fractures, all sufficient to produce death; a dislocated left shoulder; and a wound in the left temple extending through and fracturing the jaw and knocking out a tooth.
Whatever the appellant's state of mind might have been at the beginning of the "tussling", the number of blows struck, the force employed, the unarmed status of Mrs. Clayton and the other circumstances surrounding the unfortunate incident indicate that there was sufficient time for appellant to have formed the intent to kill Mrs. Clayton and that he did form and carry out this design. The facts established were sufficient to support the inference obviously drawn by the jury that appellant did effect the death of Mrs. Clayton by premeditated design. This would be sufficient to supply this element in the killing of Roger Glenn Clayton as well.
Finding no reversible error and that the evidence was sufficient to support the verdict and judgment of murder in the first degree, the judgment appealed from must be and is hereby
Affirmed.
ROBERTS, C.J., and THORNAL, J., and WILLIS, Circuit Judge, concur.
THOMAS, HOBSON and DREW, JJ., dissent.
*414 THORNAL, Justice (concurring).
I concur in the opinion and judgment prepared by Mr. Justice O'Connell.
After a detailed examination of the entire record I deem it appropriate to make certain additional observations. This is done to preclude any suspicion that the matters hereafter discussed have been overlooked.
In view of the delicate balance between the claimed encroachment upon appellant's asserted constitutional rights and the contentions of the State that he was accorded a full measure of due process, it should be recorded that the instant case has received much more than ordinary consideration by every member of the Court.
Inasmuch as Section 924.32, Florida Statutes, F.S.A., requires us to review the evidence to determine whether the ends of justice require a new trial, there are several additional factual aspects of the case which appear to me to point to the ultimate justice of the jury's verdict.
Every detail of Dawson's confession, except the actual commission of the crime, was corroborated by the testimony of other witnesses. Two witnesses saw him in the company of Mrs. Clayton and her two children shortly prior to the time which, by his confession, he admitted committing the homicides. One of these witnesses placed him in the station wagon with the three victims driving down a road in a direction which led to the site of the crime. Dawson's activities following the homicides, as reported by his confession, were in every respect consistent with the testimony of other witnesses who saw him after the crime. His conduct after the homicides, as described by him from the witness stand when he accused the husband of Mrs. Clayton, is in part inconsistent with the testimony of these other witnesses. Although Dawson testified to seeing Mr. Clayton bludgeon his wife to death, other witnesses accounted for the whereabouts of Clayton on the fatal day with such minute detail that it would have been almost an impossibility for him to have committed the criminal act. The point of these factual observations simply is that the circumstantial evidence is completely consistent with the details revealed by the confession, whereas it is not equally consistent with the details described by Dawson from the witness stand when he undertook to repudiate his confession.
Admittedly, the rule is that in a capital case, particularly, a coerced confession will not be permitted to contribute to a judgment of guilt regardless of the presence of other evidence which would likewise tend to sustain the judgment. The purpose of the foregoing observations is merely to underscore Justice O'Connell's conclusion that the evidence supports an affirmance of the judgment. I have the further view that once the confession is found valid, conviction is almost inescapable. Certainly, the gruesome details of this hideous crime as revealed by the confession precludes any impulse on my part to award a new trial on any concept suggested by the "ends of justice." Section 924.32, supra.
Another aspect of the record which I feel requires more detailed note is the period of delay between the arrest on the morning of April 14, and the first confession which was made on the afternoon of April 20. During the interval there is no evidence that Dawson was taken before a magistrate as required by Section 901.23, Florida Statutes, F.S.A. Actually, the appellant does not urge this as an element which adversely affected the validity of his confession. This would justify a conclusion that appellant considers the point to be of no important consequence in his assault on the admissibility of the confession. Certainly there is no insistence that the detention as such constituted any coercive pressure. However, because we are here concerned with the execution of the supreme penalty of the law, this element should not stand unnoticed by our opinion *415 even though it is not asserted as an aspect of the general attack on the confession.
Since 1943, the Supreme Court of the United States, in the exercise of its supervisory jurisdiction over the federal judicial system, has consistently measured the validity of extra-judicial confessions by the degree of promptness with which federal officers present an accused to a committing magistrate as prescribed by Rule 5, Federal Rules of Criminal Procedure, 18 U.S.C., and its predecessor statute, Title 18 U.S.C. § 595. The requirements of the current Federal Criminal Rule 5, are similar to those enacted by the Florida Legislature, in Section 901.23, Florida Statutes, F.S.A. So far as we can ascertain, similar provisions requiring that an officer who arrests a person without a warrant "shall without unnecessary delay" take such person before a committing magistrate, have been promulgated by practically all of the states. With almost equal unanimity the state and federal courts have held that compliance with this procedural requirement in and of itself is not an essential element of due process in determining the admissibility of confessions obtained in state criminal proceedings. It should be borne in mind that we are here dealing with extra-judicial confessions.
The rule governing the federal courts was originally announced by the Supreme Court of the United States in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, when Title 18, U.S. Code, Sec. 595, was in effect. It was reaffirmed in Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100, after the adoption of Federal Criminal Rule 5, supra. It was subsequently reaffirmed in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. Numerous other United States Supreme Court decisions have adhered to the rule in the federal system. It is now generally referred to as the McNabb-Mallory Rule. See Enwall, Admissibility of Ad Interim Confessions, Vol. 2, Univ. of Fla. Law Review, 330. As we shall later emphasize, the highest court in the country has consistently declined to apply the rule as an essential of due process in state criminal proceedings. However, this demonstrated concern by our highest court has impelled the Attorney General of Florida to advise state law enforcement officers to exercise caution to meet the requirements of Section 901.23, Florida Statutes, F.S.A., even though the prescription of the statute does not occupy the status of an element of due process in the state courts. See Opinion of the Attorney General, 061-128, August 8, 1961. We deem it fitting to add our own admonition that prosecuting officials and law enforcement officers follow the advice given by this State's Attorney General as a precaution against the possibility that on some future occasion the rule might be extended to state courts as an aspect of 14th Amendment due process.
In Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, the Supreme Court of the United States initially invoked the due process clause of the 14th Amendment to invalidate a state court conviction based entirely upon a coerced confession secured by physical force and violence against an accused by state officers. The evidence of the brutal physical abuse was undisputed. The Court concluded that the due process clause condemns such state action as being inconsistent "with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." In Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, the United States Supreme Court concluded that a state court confession obtained under circumstances amounting to mental and psychological torture of the accused, is afflicted with the same vice as one obtained by physical abuse. As a result of these decisions the matter of the voluntariness vel non of a state court confession was elevated to the level of federal constitutional concern. To date there has been no change in these general propositions whenever confessions in state criminal proceedings have been subjected to the *416 test of 14th Amendment due process. The rule applicable to state courts is that whenever a consideration of "the totality of the circumstances" fails to reveal coercive forces sufficient to overcome the volition of the accused the confession will be upheld regardless of compliance with procedural stipulations such as those announced in Section 901.23, Florida Statutes, F.S.A. The crux of the requirement is that the confession be voluntary. If it is, it is admissible in the state court. Obviously the objective is to prevent physical or mental tortures which have been known to induce innocent parties to confess crimes which they did not commit, as well as to afford full protection against compelled self-incrimination. See, "Why Men Confess" by John Rogge.
The voluntary or involuntary nature of a confession will depend upon whether the accused, at the time he confesses, is in possession of sufficient mental freedom to confess or to deny participation in the crime under investigation. The mere questioning of the accused for reasonable periods while he is in the custody of state police officials does not ipso facto violate due process even though it results in a confession. Under the decisions of the Supreme Court of the United States the determination of the validity or invalidity of a state court confession requires a consideration of a "totality of the circumstances", appearing from the undisputed facts in the record. The reconciliation of conflicts in testimony bearing upon the voluntariness of the confession is the responsibility of the state court. Compliance or non-compliance with federal organic requirements will be determined solely from the undisputed and non-conflicting testimony presented. The state trial judge initially decides upon the competency of the confession out of the hearing of the jury. The same evidence then goes to the jury which passes upon its credibility. Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801; Gallegos v. Nebraska, 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86; Malinski v. N.Y., 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166.
In reviewing the "totality of the circumstances" bearing upon the legitimacy of a state court confession the presence or absence of numerous elements have been considered. These included systematic, persistent, prolonged interrogation; unlawful detention; failure to inform the accused of his right to decline to make a statement and other organic rights; denial of access to counsel or friends; mental incapacity; degenerate character; ignorance, and age, either youth or senility. This is merely a brief illustrative catalogue of the many elements that have been considered in various cases. However, it is essential that there be a composite coercive effect of the various forces which destroys the volition of the suspect and produces an uncontrollable compulsion to confess. If the circumstances fail to support a conclusion that the volition of the accused has been destroyed and that he has been the victim of mental or physical compulsion his confession is admissible. Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522; Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246.
We return to our consideration of the applicability of the McNabb-Mallory requirement to state court confessions. It should be borne in mind that under the McNabb-Mallory rule a confession, regardless of its voluntary nature, is held inadmissible merely because of the failure of a federal officer to present the accused before a federal committing magistrate "without unnecessary delay." The period of delay which is considered to be "unnecessary" is not defined, either by the federal rules of criminal procedure or by the decisions. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140. Under McNabb, the delay in arraignment alone is considered by the court sufficient to destroy the voluntariness of the confession. Almost unanimously this rule has been held inapplicable to state criminal *417 proceedings. In other words, in the state courts, if the circumstances reveal a confession otherwise voluntary and uncoerced by any overpowering physical or mental compulsion, it will not be rendered invalid solely by mere delay in presenting the accused to a magistrate. Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448; Cicenia v. La Gay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523; United States ex rel. Peterson v. La Vallee, 2 Cir., 279 F.2d 396, cert. den., 364 U.S. 922, 81 S.Ct. 289, 5 L.Ed.2d 262; Brown v. United States, 5 Cir., 228 F.2d 286, cert. den. 351 U.S. 986, 76 S.Ct. 1055, 100 L.Ed. 1500; United States ex rel. Mayo v. Burke, 93 F. Supp. 490, aff'd, 3 Cir., 185 F.2d 405, cert. den., 341 U.S. 922, 71 S.Ct. 739, 95 L.Ed. 1355; State v. Bunk, 4 N.J. 461, 73 A.2d 249, 19 A.L.R.2d 1316; Maguire, Evidence of Guilt, Chap. 4; Vol. XVII, Washington and Lee Law Review, Fall 1960, p. 238, Kent v. United States, 1 Cir., 272 F.2d 795; Joseph v. United States, (CA 5 Tex.), 239 F.2d 524; Bright v. United States, 8 Cir., 274 F.2d 696. A complete discussion of the McNabb-Mallory rule in its relation to state jurisdictions is contained in State v. Bunk, supra. A comprehensive compilation of the decisions of the state and federal courts is presented in the annotation appearing at 19 A.L.R.2d 1331. Our research of the decisions subsequent to the cited annotation fails to reveal any state or federal court, with the exception of the Michigan Supreme Court, People v. Hamilton, 359 Mich. 410, 102 N.W.2d 738, which has held the McNabb-Mallory requirement applicable to state extra-judicial confessions.
We, ourselves, have several times held that the McNabb-Mallory rule does not govern confessions obtained by Florida law enforcement officers. We announced this position as recently as Leach and Smith v. State, Fla. 1961, 132 So.2d 329. Admittedly, the last cited decision involved a situation which the United States Supreme Court itself has decided does not justify application of McNabb. In Leach and Smith, supra, the confessions were obtained while the suspects were otherwise legally incarcerated in the State prison pursuant to convictions of other crimes. United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48; Palakiko v. Territory of Hawaii, 9 Cir., 188 F.2d 54; Palakiko v. Harper, 209 F.2d 75, cert. den., 347 U.S. 956, 74 S.Ct. 683, 98 L.Ed. 1101. Regardless of this distinguishing aspect, we did announce our position in Leach and Smith, supra, to the effect that McNabb is not considered by us to be controlling in Florida. In so doing we reaffirmed the position which we had earlier taken in Finley v. State, 153 Fla. 394, 14 So.2d 844, and Singer v. State, Fla. 1959, 109 So.2d 7.
After a comprehensive analysis of the totality of the circumstances we fail to find here present evidence of coercive or compulsive pressures sufficient to depress Dawson into a state of irresistible mental submissiveness which had destroyed his volition when he confessed this heinous crime. He admitted that there was no physical abuse. He did charge that a deputy sheriff threatened to "turn him over to the mob." Actually, there was no evidence of any mob. Of course the deputy denied such threats. Certainly, the transcript of the confession given in response to questions by the State Attorney reveals that Dawson was thoroughly advised that his confession must be voluntary and that he was not required to make it. At this point the deputy was not even present. Prior to the confession, Dawson made three voluntary appearances before a polygraph operator of the Florida Sheriffs' Bureau. On each occasion he was informed that he did not have to answer the questions. He was also advised that he could have a lawyer present if he desired one. Dawson was not a stranger to the community or to the people involved. He had lived in the area nearly fifty years. He knew most of the law enforcement officers by their first names. The confession was not the product of any prolonged, intensive, continuous interrogation. He was *418 not deprived of either food or sleep. So far as this record reveals there was not any element of so-called "third degree" methods which would deprive the confession of the aspects of fundamental fairness required by due process.
A final point merits emphasis. Dawson confessed the first time on April 20, 1960. He was taken to the scene of the crime where he identified various aspects of the circumstances surrounding the homicides. On May 2, 1960, twelve days after the initial confession, the accused, with his consent, was again examined by the polygraph operator of the Florida Sheriffs' Bureau. On this, the fourth interrogation by this officer, Dawson was again advised in detail of all of his constitutional and statutory rights. Thereafter he repeated his confession of the crime.
At the risk of what could be considered a burdensome discussion, it has seemed advisable to mention in detail some of the elements of this case which justify an affirmance and which preclude the application of a purely procedural rule to destroy the validity of the confession. Although it might have been possible to have obtained the conviction without the confession, it is certainly evident that the confession concluded the case against the appellant. At the outset we suggested that law enforcement officers cautiously and carefully abide by the legislative requirements governing the arrest and detention of those accused of crime. However, we must likewise be mindful that in the enforcement of the criminal laws the officers should not be unduly hamstrung or suffer their efforts to be severely circumscribed by procedural restrictions short of those catalogued as essential to due process. After all, the public does have an interest in the apprehension and conviction of criminals.
I can find no violation of the constitutional rights of the appellant and it appears to me that the evidence is more than adequate to sustain the finding of guilt.
I, therefore, join in the opinion and judgment of affirmance.
ROBERTS, C.J., and O'CONNELL, J., and WILLIS, Circuit Judge, concur.
DREW, Justice, dissenting:
Upon several grounds I am impelled to dissent from any affirmance of the judgment of conviction in this cause.
The record reveals a direct and material violation of our statutory mandates[1] governing trial of offenses divided into degrees by failure to include in the instructions to the jury any definition of or reference to the offense of murder in the third degree under our homicide laws.[2] The significance of this omission is apparent from a consideration of the evidence relating to the commission of the homicide. Deferring for the moment the issue of admissibility, the defendant's confession, upon which the State concedes his conviction depends, states positively that the child for whose murder defendant was tried and convicted was killed in the course of an assault upon *419 the child's mother. Upon the pivotal point defendant's statement was:
"Q You hit her with the hammer?
"A Yes sir, fighting with the hammer, wasn't intending to be hit her with the hammer  the children wasn't even hit at with the hammer, not intending to be hit, they got theirs with an accident." (Emphasis supplied.)
This version of the homicide, not contradicted by other evidence, could not under our cases be ignored by the jury.[3] If accepted as proof of defendant's guilt vel non it must certainly be given evidentiary effect as indicating the character of the assault, and would require that the jury be given an opportunity, if they considered the confession to be credible in the first instance, to find that the killing of the child was a homicide "perpetrated without any design to effect death, by a person engaged in the commission of [a] felony other than arson, rape, robbery [or] burglary."[4] Even if other factors in the case might permit a finding of premeditation and go to sustain a consequent conviction of murder in the first degree, if upon any theory the jury could lawfully find that the fatal blows were struck without a "premeditated design to effect the death of * * * any human being,"[5] or if the evidence as to the mother's death would, for instance, permit a finding of second degree murder of the little boy, then the homicide in this case could be no higher offense than murder in the third degree. The evidence thus clearly required a definition of that offense, and upon this ground the instant case is to be distinguished from those in which the omission has in the past been excused.[6] The law and reasoning heretofore detailed[7] thus applies with greater force in this situation, and to sustain the verdict and judgment here would be to negate entirely the specific requirements of the controlling statute.[8] I hold, therefore, this omission to be fundamentally erroneous and harmful.
Even more fundamental, however, are my objections to the circumstances attendant upon the taking of defendant's confession, without which, as I have heretofore stated, the State admits the conviction cannot stand. Conceding the accuracy of the statement of law in the opinions of my brethren with respect to the admissibility of confessions generally, I am of the opinion, after a consideration of the "totality of the circumstances" in this case, fully set forth below, that the uncontroverted physical facts of defendant's detention cannot be satisfactorily explained other than by concluding that his inquisitors by words and actions induced fear sufficient to help propel and consequently invalidate his confession;[9] further, that, disregarding all disputed testimony as to threats or verbal duress, the violation of F.S. Sec. 901.23, F.S.A.,[10] by wholly unnecessary delay between *420 arrest and arraignment requires, in the particular circumstances of this case, the exclusion of the confession procured during that time. I would adopt the view that protracted delay can in some situations, independent of proof of physical or verbal threats or abuse, amount to the equivalent of duress and that such flouting of the statutory prescription can be prevented in no way other than by exclusion of its product.[11] It would be unreasonable, I think, to say that the omission of judicial arraignment could not have materially affected defendant's "capacity for self-determination"[12] in this case. In substantiation of these conclusions, the record picture of the period in question is presented at length.
This Negro defendant was 49 years old at the time he was tried. He stated that he had lived all his life in the community where the crime was committed. He could neither read nor write, had lost one leg in a manner not revealed by the record, was a victim of syphilis, and, as is the case with most of his race in the area, the record clearly supports the assumption that he was an individual of servile character and personality, particularly while in the custody of white officers of the law.
On the morning of Thursday, April 14, 1960, shortly after the discovery of the crime, the defendant was picked up on a road near his home and arrested without a warrant by a constable who took him in his automobile to a point on the road where he was met by a deputy sheriff. They proceeded to a nearby scene of the crime where some fifty to seventy-five people had congregated and the defendant remained with the constable while the deputy got out, looked around, and, according to the constable, went to see a justice of the peace who told him to take defendant to jail. The deputy, according to statement of defendant not specifically denied, said "I better get him out here now * * * `cause the mob will have him.'" The deputy took defendant from the scene, remarked on the need for speed, called the Florida Highway Patrol on his radio to meet him at the Gadsden County jail in Quincy some 25 miles distant. Upon arrival at the Quincy jail he was transferred to the car of the road patrol who "told [him] to get down and scrouch down." The deputy, according to defendant, said stay down "to keep anybody from seeing me getting away from there. That the mob would get me before he could get me out of there." He stayed down for the duration of the 25 mile ride to the jail in Tallahassee, Leon County, where the jailer told him to go on back quick so they could "lock me up in one of them back cells where nobody wouldn't know I was back there." He remained there alone several hours, then policemen and others came to help him get downstairs quickly and out the back door, because of his difficulty in moving fast with a crutch on slippery floors. He was rushed to the sheriff's car and told "As quick as you can make it to *421 the floor, you lay down in there." He was then driven without stopping to the state penitentiary at Raiford, in Union County, about 145 miles away, but was allowed to raise up when they were "way on down the road there." At Raiford he was taken to the "flat top," where he was kept until the next day.
On Friday morning, April 15, the deputy sheriff came to Raiford and talked to defendant a short while. Illustrative of the conversations reported by defendant and denied by the officer is the following: "He told me to go ahead and testify and if I didn't * * * he would keep on hauling me up and down this road * * * the mob would get me and he said he would rather the mob get me than get him." He was also questioned briefly by the prosecuting attorney, after which they took him by car from Raiford to the jail in Perry, approximately 100 miles distant, arriving there sometime in the afternoon. The deputy went into the jail first and defendant at that time had a discussion with the prosecuting attorney, conceded by the latter, about getting a lawyer. The attorney stated, "At that time he told me that if he could get back to Gadsden County, that he either had a lawyer or that he could arrange for a lawyer if he got back * * *." Defendant, upon request, gave the deputy the clothing he had been wearing, changed into substitutes and was placed in a cell by himself upstairs in the Taylor County jail in Perry. That night two men, one with a gun, took defendant from jail, put him in a car and took him to a point near Tallahassee in Leon County, a distance of 52 miles, where he was transferred to the deputy's car once more, and still in the night, was taken to the Sheriff's Bureau in Tallahassee where a lie detector test was given him for a period of time somewhere between one and one-half and three hours, which was terminated because he apparently went to sleep. He was taken to the Leon County jail in Tallahassee about 3:00 a.m., according to officers, the defendant stating that "As soon as I lay down, it was day."
Sometime during that night of April 15th or early on the 16th, defendant's home in Gadsden County was destroyed by fire. The record does not reflect how this happened or precisely when defendant learned of it.
Later the same morning of Saturday, April 16th, or about dinner time in the middle of the day, the deputy returned, another lie detector test was given, and defendant was again questioned in a private room in the jail in Tallahassee for a period of several hours. Further controverted statements of defendant were: "He kept telling me about if I didn't go to work and testify, he'd turn me over to the mob when we get around there in the bushes." As on other occasions the deputy asked repeatedly, in his own words perhaps "two dozen times," whether defendant killed Mrs. Clayton and her child. The record is conflicting as to interrogation on Sunday, although the deputy at one point states he questioned defendant every day during this period and that he could not remember the number of times because he worked on the case day and night until after defendant confessed.
On Monday, April 18th, defendant was again interrogated for a period of hours and was taken either on this date or the following day for a third lie detector test and to a clinic for shots or treatment given, according to officers, for syphilis. On the afternoon of Tuesday, April 19th, the defendant was again subjected to questioning for several hours upstairs in the jail in Tallahassee.
The deputy, on Wednesday, April 20th, obtained photographs of the wounded but surviving Clayton child, took them to the jail in Tallahassee about 1:30 p.m., showed them to defendant and interrogated him through the afternoon in a private room upstairs in the jail. The deputy then, at or about five o'clock, called the prosecutor, sheriff, and a stenographer, turned defendant over to them and left. The confession which forms the basis for defendant's conviction was then transcribed, defendant stating in substance that he had fought with *422 the mother of the deceased child for whose murder he was tried, had hit her with a hammer which she threw, and unintentionally hit the children who were in the car.
The defendant's testimony at the trial, denied by the interrogating officer, was that during the final period of questioning, as on prior occasions, the deputy "told me what I had to testify that day," and "kept telling me about the mob," and "told me how to testify." Defendant "didn't know who the mob was and I didn't have nobody to help me and couldn't get them to tell me where I could get nobody to help me or a lawyer or nothing * * *. I was afraid they would carry me and turn me over to the mob and so I had to tell them something or other * * *." Upon inquiries at trial as to this period of interrogation the deputy's testimony was:
"Q. Then did you go over the confession with him?
"A. I talked with him on part of it. I talked with him about him killing her and how he done it and then I quit. I was give out.
"Q. And Sie wasn't give out?
"A. Well, he hadn't said nothing. He was just sitting there listening. I was doing all the talking.
"Q. And you were exhausted?
"A. I sure was."
The defendant was thereafter taken to the scene of the crime by the sheriff, who reported that he repeated his incriminating story. He was returned to the Gadsden County jail in Quincy, where he later repudiated his confession and stated, substantially as he did at trial, that the father of the deceased child had, while all parties were in the Clayton station wagon, wielded the fatal blows and threatened defendant's life if he told what he saw. A fourth lie detector test was administered to defendant on May 2nd, he was indicted for first degree murder on May 5th, and arraignment and trial followed on June 22nd, 1961.
While it is impossible to determine with any certainty from the record the number of hours defendant was actually subjected to questioning during the seven days and six nights intervening between his arrest and confession, a careful analysis of the testimony of investigating officers indicates a minimum of twelve and one-half hours with competent evidence to allow a finding of as much as thirty hours' interrogation. The cumulative period of questioning was certainly extensive, but of equal significance are the total duration and circumstances of his detention; the complete absence of communication between defendant and any person other than officers of the law, and the obstacles of distance, etc., in the path of such communication; and the diverse pressures and fears operating upon this particular defendant throughout the period.
The right of a free man to be presented to a sworn judicial officer promptly upon his arrest is not a technical or trivial right. Such rights are the bedrock of our liberties and have grown out of mankind's experiences over hundreds of years. These rights are so fundamental in our concept of justice that they are embodied in the written laws of every state in this nation. I cannot accept the proposition that the lawmakers, in enacting statutes such as these, ever intended that the positive mandate of immediate presentment could be ignored by the public officials if the evidence showed the ultimate product to be otherwise voluntary. Practical men know that the question of whether a confession is freely and voluntarily made is determined by weighing the evidence produced by those who obtained the confession and are responsible for it. Every person who can read is familiar with the methods used in some areas of the world to obtain confessions. The methods there used have become commonly known as brainwashing. We have not applied that definition in this country but the evidence revealed by the record in this case makes it rather difficult *423 to distinguish what has happened here from what often happens there. The mandates of the written law are as clear as the noon day sun and it certainly is imposing no hardship upon the sworn officers of the law to require their adherence to it.[13] Moreover, prompt adherence to the requirements of the law in every instance would add immensely to the validity of a confession thereafter obtained and would remove from the minds of the judge and jury many of the doubts and uncertainties so often present in these cases.
The totality of events in the case at bar will, in my opinion, fully sustain the conclusions above: that the confession was in fact the product of duress, or, alternatively, that even in the absence of direct proof going to the voluntary character of the confession, the lack of any effort to comply within a reasonable time with the arraignment statute,[14] embodying a universally recognized safeguard in the penal process, should in the circumstances of this case invalidate the confession obtained in that interim.
THOMAS, J., concurs.
HOBSON, Justice (Retired) (dissenting).
Although I agree with that part of the majority opinion prepared by Mr. Justice O'CONNELL which holds that the confessions were not involuntary, I must dissent from the conclusion reached and the judgment of affirmance. I agree with Mr. Justice O'CONNELL's approval of the ruling made by the learned trial judge and the finding of the jury in holding that the confessions were not coerced or procured by threats, intimidation, physical brutality or mental torture, but were made by Sie Dawson voluntarily and of his own free will.
In my opinion the failure upon arrest to take the accused before a committing magistrate "without unnecessary delay", [Section 901.23, F.S.A.] of which omission I am naturally critical, does not, ipso facto, invalidate the confessions as a matter of law. This dereliction on the part of the officers who apprehended the appellant is merely a circumstance, under the law obtaining in this jurisdiction, to be considered in connection with the determination of the question whether the confessions were voluntarily or involuntarily given.
As required of each member of this court by Section 924.32(1), F.S.A., I have read very carefully the transcript of the testimony and am conscientiously impelled toward the view that "the interests of justice require a new trial". Consequently, I would reverse and remand with directions that a new trial be granted.
NOTES
[1] "If the indictment or information charges an offense which is divided into degrees, without specifying the degree, the jurors may find the defendant guilty of any degree of the offense charged; if the indictment or information charges a particular degree the jurors may find the defendant guilty of the degree charged or of any lesser degree. The court shall in all such cases charge the jury as to the degrees of the offense." (Emphasis supplied) F.S. Sec. 919.14, F.S.A.
[2] "Murder * * * When perpetrated without any design to effect death, by a person engaged in the commission of any felony, other than arson, rape, robbery [or] burglary, * * * it shall be murder in the third degree, and shall be punished by imprisonment in the state prison not exceeding twenty years." F.S. Sec. 782.04, F.S.A.
[3] Mayo v. State, Fla. 1954, 71 So.2d 899; Jenkins v. State, 120 Fla. 26, 161 So. 840.
[4] § 782.04, F.S., paragraph 3, F.S.A.
[5] § 782.04, F.S., paragraph 1, F.S.A.
[6] Brown v. State, Fla., 124 So.2d 481, citing Sec. 918.10(4), F.S., and earlier decisions on the point.
[7] Id., at 485-488.
[8] F.S. Sec. 919.14, F.S.A., note 1 supra.
[9] Chambers v. State of Florida, 123 Fla. 734, 167 So. 697; Culombe v. Connecticut, 1961, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037.
[10] "Duty of officer after arrest without warrant.

"An officer who has arrested a person without a warrant, shall without unnecessary delay take the person arrested before the nearest or most accessible magistrate in the county in which the arrest occurs, having jurisdiction, and shall make before the magistrate a complaint, which shall set forth the facts showing the offense for which the person was arrested; or, if that magistrate is absent or unable to act, before the nearest or most accessible magistrate in the same county."
The duties of the magistrate, upon presentation of the prisoner, are outlined in simple language, understandable by anyone as follows:
"902.01 Duty of magistrate.
"When the defendant is brought before the magistrate upon an arrest, either with or without a warrant, on a charge of having committed an offense which the magistrate is not empowered to try and determine, the magistrate shall immediately inform him:
"(1) Of the charge against him.
"(2) Of his right to the aid of counsel during the preliminary examination,
"(3) Of his right to waive such examination, and
"(4) Of his right to refuse to testify, and also caution him that in the event he does testify, anything which he says may be used against him in a subsequent proceeding."
[11] Documentations on this controversy are cited at length in the majority opinions. Cf. Leach v. State, Fla. 1961, 132 So.2d 329, involving detention by virtue of prior legal incarceration, but containing a statement of the rule previously applied in this state. For full statement of the doctrine and applicable authorities see Anno. 19 A.L.R.2d 1331, and Vol. 2, Univ.Fla.L.R., 330.
[12] Culombe v. Connecticut, note 9 supra, 367 U.S. 568, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037.
[13] See opinion of the Atty. Genl., State of Florida, No. 061-128, August 8, 1961.
[14] F.S. Sec. 901.23, F.S.A., note 10 supra.